390 F.2d 915
 David B. GOODMAN and Theresa L. Goodman, Estate of Herbert S. Goodman, Deceased, Gladys C. Goodman, Executrix, and Gladys C. Goodman, surviving wife, Harry Mabel, surviving husband, and Estate of Florence Mabel, Deceased, Harry Mabel, Executor
v.
The UNITED STATES.
 No. 122-61.
 United States Court of Claims.
 February 16, 1968.
 
 Robert B. Hodes, New York City, for plaintiffs, Thomas N. Tarleau, New York City, attorney of record. Edwin H. Baker and Willkie, Farr, Gallagher, Walton & FitzGibbon, New York City, of counsel.
 D. Knox Bemis, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant. Philip R. Miller, Washington, D. C., of counsel.
 Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, SKELTON, and NICHOLS, Judges.
 OPINION
 PER CURIAM:
 
 
 1
 This case was referred to Trial Commissioner Marion T. Bennett with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report filed on February 2, 1965 and an opinion filed on February 15, 1967. Exceptions to the commissioner's findings and recommended conclusion of law were filed by the plaintiffs, and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court is in agreement with the findings, opinion, and the recommended conclusion of law of the commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Plaintiffs are, therefore, not entitled to recover and the petition is dismissed.
 
 
 2
 Chief Commissioner Bennett's opinion,* as modified by the court, is as follows:
 
 
 3
 After oral argument on the findings of fact of the trial commissioner and the submission of supplemental briefs, the court, on May 16, 1966, acceded to plaintiffs' request that this case be remanded for reconsideration in light of the decision of the Supreme Court in Malat v. Riddell, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966), which was announced after the commissioner's findings were filed. The order of remand authorized the commissioner "to the extent appropriate, to make new or additional findings in the light of that decision, with leave to the trial commissioner, if he deems it necessary or desirable, to allow the parties to present further evidence."
 
 
 4
 On December 1, 1966, the court entered a further order directing the commissioner to submit recommendations for conclusions of law. Thereafter, the commissioner directed the parties, within a time stated, to make such submissions as they wished him to consider before he complied with the orders of the court. Plaintiffs, on January 3, 1967, filed a motion for leave to present further evidence. Plaintiffs subsequently requested and were granted oral argument on the motion. After hearing counsel and considering the motion and defendant's objections thereto, it was concluded that plaintiffs had failed to show that the extensive record already made did not contain an adequate presentation of their case.[1] It was also concluded that plaintiffs had no newly discovered evidence or evidence that could not have been presented at the trial already held, and the motion was denied by order entered January 31, 1967. This order also precluded the parties from making any further submissions to the commissioner on the grounds that all that could usefully be said had already been said, and undue delay would otherwise result. The considerations advanced by plaintiffs in their motion and oral argument and in their briefs and exceptions to the court will be considered hereafter.
 
 
 5
 The facts and the law clearly demonstrate, as indicated in the ultimate finding heretofore made, that plaintiffs held real estate principally for sale in the ordinary course of business and are not entitled to capital gains treatment of their profits, which thus bars them from recovery in this suit.
 
 
 6
 There is little disagreement about the basic facts, many of which are stipulated. From 1929 through the relevant years of 1953, 1954, and 1955, David and Herbert Goodman and Harry Mabel were law partners practicing in New York City under the firm name of Goodman & Mabel. They specialized in real estate law. Such practice led to opportunities to buy and sell realty and to place mortgages on real estate for their own interests, as well as for clients and associates. They were not licensed real estate brokers nor did they hold themselves out as such.
 
 
 7
 Plaintiffs always participated in real estate ventures together. They typically participated as part of a group or syndicate. The sponsor of the venture was usually a client. Sometimes these clients and sponsors were real estate brokers. On occasion, plaintiffs acted as agent for a venture and collected rents and made disbursements for expenses. They kept a separate "real estate" bank account for these activities.
 
 
 8
 Plaintiffs' real estate holdings were extensive, their value considerable, and the turnover constant. The cash flow, representing income generated by properties and return of capital, shows that in the year 1953 cash receipts were $220,730.61; in 1954 they were $191,183.35; and in 1955, $245,897.25. During the years 1950-58, plaintiffs owned stock in 4 to 11 realty corporations and held from 35 to 57 different interests in realty partnerships and from 6 to 21 realty mortgages. Their ownership interest normally ranged between 15 and 25 percent. The adjusted cost basis of plaintiffs' total ownership of real property interests between 1950 and 1958 exceeded $397,000, and the fair market value of their interests was much more. During the period 1950-58, plaintiffs averaged 36 transactions annually, comprising purchases and sales of interests in realty, realty corporations or realty mortgages.
 
 
 9
 During the years 1953, 1954, and 1955 involved in this suit, plaintiffs sold 32 different realty interests. Of these, 15 had been held less than 6 months and only 5 had been held as long as 5 years. In the 7 years 1950-56, plaintiffs' net income from the sale or disposal of their interests in real estate averaged $48,261.33 per year, and in 1 year exceeded $91,000. This may be contrasted to their $35,001.12 average annual net income from the practice of law during the same years. Their net income from other sources related to real estate is represented by interest on realty mortgages, dividends and salaries from realty corporations, and income from realty partnerships. Such income for the years 1950-56 averaged $44,919.39 per year. It is apparent that during these years profits on purchases and sales of interests in real property constituted plaintiffs' largest single source of income. Plaintiffs treated this income from sales of property held more than 6 months as capital gains but it was held to be ordinary income and taxable as such by the Internal Revenue Service. The amounts of taxes paid, deficiencies assessed and paid, and refunds sought are stipulated by the parties and are not in dispute here.
 
 
 10
 The statutory test and issue in this case is whether the real property sold by plaintiffs was held "primarily for sale to customers in the ordinary course of * * * [their] trade or business."[2] If it was so held, the profits were taxable as ordinary income. Otherwise, the lower capital gains rate applies. Such a problem is basically one of fact to be decided on the particular circumstances of the case, Browne v. United States, 356 F.2d 546, 174 Ct.Cl. 523 (1966), and no one circumstance or factor is controlling. Bauschard v. Commissioner of Internal Revenue, 279 F.2d 115 (6th Cir. 1960).
 
 
 11
 In Malat v. Riddell, supra, the Supreme Court resolved conflicts among certain Courts of Appeals with regard to the meaning of the term "primarily" as used in the Internal Revenue Code of 1954. The Court said: "We hold that, as used in § 1221(1), `primarily' means `of first importance' or `principally.'" The courts below had incorrectly construed primarily as meaning that a purpose may be "primary" if it is a "substantial" one.
 
 
 12
 In the instant case, the ultimate finding states, in part:
 
 
 13
 * * * the weight of the credible evidence shows that they bought and held the subject property primarily for sale during the years in issue and during other relevant years. This is evidenced by the magnitude of their holdings, the extensive, frequent and continuous sales of the same, frequent short holding periods, the large amounts of money involved in these transactions, segregation of proceeds of sales for purchase of other real estate interests, and the profits derived from such ownership and sales as compared to plaintiffs' other income from the practice of law. Their testimony that their ventures in real estate were motivated primarily by interest in rental income and not in sales, is uncorroborated by the testimony of other co-owners and is contrary to the weight of the evidence. The evidence establishes, through the totality of their actual purchases and sales, that plaintiffs held the subject real estate primarily for sale in the ordinary course of their business. [Emphasis added.]
 
 
 14
 Individuals may conduct more than one business at a time and each will be taxed accordingly. Crosswhite v. United States, 369 F.2d 989, 177 Ct.Cl. 671 (1966), collecting cases. Clearly, buying and selling realty was one of the businesses of the partners. Moreover, it was their biggest business, and the primary purpose of it was not investment but sales for profit in the ordinary course of business. We emphasize in particular the frequency and continuity of sales in reaching this conclusion. See, e. g., Brown v. Commissioner of Internal Revenue, 143 F.2d 468, 470 (5th Cir. 1944); Ehrman v. Commissioner of Internal Revenue, 120 F.2d 607, 610 (9th Cir. 1941). The fact that plaintiffs also practiced law and had income from investments and other sources does not disturb the character of their real estate activity as a separate business, nor does it affect the tax treatment to be given that separate business.
 
 
 15
 Plaintiffs argue that there are several activities generally associated with the holding of real estate for sale and that the absence of a finding of these activities in the instant case should operate to negate the conclusion that there was a holding for sale. These activities include soliciting and advertising for sale, and the development, subdivision, and/or extensive improvement of the property. In support of this argument plaintiffs cite Miller v. United States, 339 F.2d 661, 168 Ct.Cl. 498 (1964); Scheuber v. Commissioner of Internal Revenue, 371 F.2d 996 (7th Cir. 1967); Victory Housing No. 2, Inc. v. Commissioner of Internal Revenue, 205 F.2d 371 (10th Cir. 1953). It is true that these activities are factors often considered by the courts in determining whether property is being held for investment or sale, and the cited cases so indicate. However, a careful reading of these cases makes it equally clear that these activities are, as Miller pointed out, merely "helpful" factors to aid in the court's deliberation, and, as the Victory opinion cautioned, "none of them are determinative. Neither is the presence nor absence of any of these factors conclusive." 205 F.2d at 372. Clearly, there is no one formula for determining whether property is held for sale or investment. Each case presents its own unique set of facts, all of which must be considered, and the absence of no one factor or set of factors is necessarily dispositive.
 
 
 16
 Also, it has been found that plaintiffs' contention that the circumstances surrounding each sale indicate that the properties were held only for rental income purposes is uncorroborated by the testimony of other co-owners and is contrary to the weight of the evidence.[3]
 
 
 17
 The best that can be said for plaintiffs' contention is that there are some facts in the record consistent with both a purpose to buy rental real estate and to sell it at a profit. But, this does not help plaintiffs. It is possible to be both in the business of renting and selling the same kind of property and to be taxed at ordinary income rates. "* * * if the entrepreneur holds out his wares either for sale or for rental, the taxation of his business gain from sales does not depend upon a comparison of sales to rentals in the particular year." Recordak Corp. v. United States, 325 F.2d 460, 463, 163 Ct.Cl. 294, 300 (1963). A dual or multiple purpose in buying real estate has not been outlawed nor do these other purposes mean that the property was not held, developed, and disposed of primarily in the ordinary course of trade or business. Bauschard v. Commissioner of Internal Revenue, supra. One must look to all the facts to find the primary purpose from which the tax consequences flow.
 
 
 18
 In plaintiffs' motion for leave to present further evidence, plaintiffs relied on Municipal Bond Corp. v. Commissioner of Internal Revenue, 341 F.2d 683 (8th Cir. 1965), and the decision of the Tax Court on remand of that case in 46 T.C. 219 (1966), and say that under these authorities it is necessary for the trier of the facts, in applying the statutory test, to make specific findings of fact and conclusions of law with respect to each of the separate properties disposed of by taxpayers. Requested findings were not submitted upon this basis. What happened in Municipal Bond Corp. is that the Court of Appeals, noting that the court below had used an erroneous interpretation of the word "primarily," was uncertain as to whether, at least with respect to some of the properties, the lower court's decision might have been based on wrongful interpretation of that word. So, the Court of Appeals directed the lower court to make findings with respect to each individual property sold and to consider the purpose for which it was acquired, the purpose for which it was held, the motive at the time of sale, and the method of sale. The Court of Appeals also observed that the operations of petitioner's other corporations would have no probative force in establishing its purpose for holding the real estate, except to the extent that it might be shown that the other corporations were acting as its agents.
 
 
 19
 The circumstances in Municipal Bond Corp. do not exist here. The Court of Claims has not misinterpreted the word "primarily" in the several cases it has decided where the statute with this word of art appears. This is not to say that in finding the facts the individual properties are ignored. Tibbals v. United States, 362 F.2d 266, 176 Ct.Cl. 196 (1966). On the contrary, as in the instant case, each is identified and all relevant factors have been considered with regard to each, including the purposes for which the land was acquired, the motive for selling, the method employed in selling, the income from the sales as compared with taxpayers' other income, the extent of improvements made to facilitate sales, the frequency and continuity of sales, and the time and effort expended by taxpayer in promoting sales. No one factor standing alone is conclusive, but rather all are taken into consideration. Bauschard v. Commissioner of Internal Revenue, supra; Crosswhite v. United States, supra. It is noted, also, that property initially purchased as an investment can later change from a capital asset to that which comes within the ambit of section 1221(1) of the Internal Revenue Code. Thompson v. Commissioner of Internal Revenue, 322 F.2d 122, 127-128 (5th Cir. 1963). The reverse is also true. Tibbals v. United States, supra.
 
 
 20
 It is not necessary to make separate findings and conclusions on each separate tract where the circumstances of each have been considered and the number of properties and sales thereof is great and frequent. The normal course of taxpayers' business is not established by an individual transaction. It is the overall, factual situation that must govern a particular case. As was said in Nadalin v. United States, 364 F.2d 431, 176 Ct.Cl. 1032 (1966):
 
 
 21
 * * * The isolation of and emphasis upon certain individual factors which constitute only threads in a complex situation should be guarded against, for it is the "total background of the transactions" and "the entire factual pattern of the case" that must govern.
 
 
 22
 Plaintiffs have not sustained their burden of proving as a fact that their real estate transactions in 1953, 1954, and 1955, which are in issue here, fell outside the broad scope of property held "primarily for sale to customers in the ordinary course" of their trade or business.
 
 
 
 Notes:
 
 
 *
 The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57(c)
 
 
 [1]
 Plaintiffs' reply brief filed September 15, 1965, states: "The testimony during trial and taxpayers' briefs accompanying its requested findings of fact carefully, and in great detail, reviewed every sale of real estate made by taxpayers during the years in issue."
 
 
 [2]
 The relevant statutory provisions are, with respect to 1953, §§ 117(a) (1) (A) and 117(j) (1) (B) of the Internal Revenue Code of 1939, and with respect to 1954 and 1955, §§ 1221(1) and 1231(b) (1) (B) of the Internal Revenue Code of 1954. These provisions of the 1939 and 1954 Internal Revenue Codes are identical insofar as pertinent to this case
 
 
 [3]
 Plaintiffs observe in their reply brief that their co-venturers were often their legal clients and in oral argument said it would embarrass plaintiffs to call them as witnesses because of the lawyer-client relationship. Plaintiffs say the defendant could have called them. But, plaintiffs had the burden of proof. Crosswhite v. United States, supra
 
 
 SKELTON, Judge (dissenting):
 
 23
 I feel that I must dissent from the opinion of the majority because I cannot agree with the result it reaches.
 
 
 24
 The majority opinion correctly states the law that in a case of this kind the statutory test and issue is whether the property sold by the plaintiffs was held "primarily for sale to customers in the ordinary course of * * * [their] trade or business." If so, the profits were taxable as ordinary income, but if not they were taxable as long term capital gains. The problem is one of fact to be decided on the circumstances of the particular case. Browne v. United States, 356 F.2d 546, 174 Ct.Cl. 523 (1966), and no one fact or circumstance is controlling. Bauschard v. Commissioner of Internal Revenue, 279 F.2d 115 (6th Cir. 1960). The word "primarily" as used in Section 1221(1) of the Internal Revenue Code of 1954 means "of first importance" or "principally." It does not mean that a purpose may be "primary" if it is a "substantial" one. Individuals may have more than one business at a time and each business will be taxed accordingly and separately. There is no one formula for determining whether property is held for sale or investment. All of the facts and circumstances in a given case must be looked to in order to determine how the profits from sales are to be taxed.
 
 
 25
 I do not quarrel with these principles of law which the majority says should control this case. I disagree with the application of these rules by the majority to the facts of the case.
 
 
 26
 The commissioner found that the plaintiffs were not licensed real estate brokers and did not hold themselves out by advertisement or otherwise as such. They were licensed attorneys at law and were engaged in the practice of law. They were invited from time to time by their clients to make investments in realty partnerships, corporations, and mortgages. Their investments in these ventures ranged from 2 to 50 per cent, but were usually 15 to 25 per cent. During the 3 years in question, the plaintiffs liquidated 17 of these investments which they had held for more than 6 months by selling them. This averaged less than 6 per year. The plaintiffs never had title to any of the real properties or mortgages in their own names. They took part in only 3 to 5 per cent of the real estate transactions in which they acted as lawyers. Their clients were the sponsors of the investments and invited plaintiffs to participate. Rent was collected on some of the properties from time to time. The plaintiffs say the profits on these investments should be taxed as long term capital gains.
 
 
 27
 The majority has unfortunately allowed two factors to control the decision against the plaintiffs, both of which, in my opinion were erroneously applied. First, they say that the income from the sale of the interests in the partnerships, corporations, and mortgages during the three years in question (1953, 1954, and 1955) was ordinary income because the sales were frequent. I do not consider that the 5 to 6 sales per year during these three years could reasonably be said to be so excessive in number as to be "frequent" within the prohibited zone of the Internal Revenue Service so as to subject the profit therefrom to the ordinary income tax. Any successful businessman could reasonably be expected to dispose of at least a half dozen investments in the period of one year. The cases cited by Judge Nichols in his dissenting opinion, namely, Dunlap v. Oldham Lumber Co., 178 F.2d 781, 784-785 (5th Cir. 1950); Lazarus v. United States, 172 F. Supp. 421, 426, 145 Ct.Cl. 541, 549 (1959); Abe Pickus, 22 TCM 1791, 1796 (1963), support the proposition that the few sales per year involved here are not "frequent or great."
 
 
 28
 In the second place, the total earnings of the plaintiffs from all sources have been thrown together as one ball of wax and then the earnings from the practice of law have been set off against plaintiffs' other earnings to show that the "other earnings" are greater than those from their law practice. Not only has this been done, but the majority has used income figures from years not involved here which increases the averages against the plaintiffs and presents a lopsided picture against them which is not supported by the figures for the three years in question. Furthermore, the majority has added ordinary income other than that from the law practice to the income from the sale of realty interests, not only for the 3 years in question, but for the period 1950-1956 (and for some purposes 1950-1958), and then compares the total with the income from law practice on an average basis over the whole period. This emphasizes that the income of plaintiffs from their law practice was far less than that from other ordinary income sources and from sales of realty interests when added together. For instance, in finding 29, the commissioner shows the total income from the law practice from 1950 through 1956 in one column, and the total income for this period as ordinary income from other sources in the second column, and income from the sale of real estate is shown in the third column. The majority uses these figures to hold that during this seven-year period (1950-1956) the average annual income of plaintiffs from the sale of realty interests was $48,261.33 (and in one year 1950 (not involved here) was $91,000); their annual average ordinary income from sources other than the practice of law was $44,919.39; and their average annual income from the practice of law was $35,001.12. The majority then sets off the total of the averages of the sales of real estate ($48,261.33), plus that of the ordinary income other than the practice of law ($44,919.39) against the total average income from the practice of law ($35,001.12). This is wrong for at least two reasons. In the first place, only 1953-1956, inclusive, should be considered and not the period of 1950-1956, inclusive, since only 1953, 1954, and 1955 are involved. In the second place, the income from the law practice should be added to the other ordinary income (on all of which plaintiffs paid ordinary income taxes) and this should be considered as against the income from the liquidation of realty investments for the three years involved. If this is done, the facts will show that the plaintiffs had an average annual income during 1953-1955 from the practice of law and from other ordinary income sources of $64,922.40, and an average annual income during the same period from the sale of real estate investments of $40,257.12. This is the fairest way to calculate plaintiffs' income. It shows that their income from the disposal of realty investments was less than 2/3 of their ordinary income. This is not enough to subject their income from the liquidation of their real estate investments during these 3 years to the ordinary income tax.
 
 
 29
 The Congress has not said that 6 sales of investments of real estate in one year means that the property was held "primarily for sale in the ordinary course of business" by the seller. Nor has it indicated that 5 or 4 or even 3 are all that the law allows in order for the taxpayer to enjoy the benefit of the capital gains tax. If the present policy of the Internal Revenue Service in this field is allowed to continue and certainly if it is expanded, all investments will be prohibited. There is nothing wrong with making a profit on an investment. In fact, investments for profit have developed our country beyond all expectations. We should encourage them instead of prohibiting them.
 
 
 30
 The number of investments in a given year in one kind or several kinds of property should be immaterial, so long as they are really and truly investments. For instance, a man might make a dozen investments in real estate in a year on which upon their liquidation after six months he would realize a total profit of $50,000. The I.R.S., according to the majority opinion, would be justified in saying he was a dealer and subject to a tax on all of his profit as ordinary income. Whereas, another investor could make one large investment during the same year which upon liquidation after six months nets him a profit of a million dollars or more. Even if this is much greater than his other income, he would be entitled to the benefit of the long term capital gains tax because he had only one sale during the year. This is discriminatory and unfair and was never intended.
 
 
 31
 It is clear that Congress intended that the term "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" would apply basically to goods on the shelf in a mercantile store or in a showroom daily exposed for sale, or in a similar situation. In real estate, it would apply to a dealer who subdivides property and sells lots, or at least has a list of properties which he holds out to the public as being for sale in the ordinary course of his real estate business. This is not the case here.
 
 
 32
 While it is true that the commissioner and the majority say that all relevant factors have been considered with reference to each realty investment, they hold that it is not necessary to make separate findings and conclusions on each separate tract "where the circumstances of each have been considered and the number of properties and sales thereof is great and frequent."
 
 
 33
 The commissioner listed in finding 28 twelve factors, among others, which motivated plaintiffs in their disposal of realty interests in addition to or concurrent with a desire to make money or avoid losing money. After listing these factors, the commissioner stated in such finding:
 
 
 34
 It is not possible from the evidence to determine how many of plaintiffs' transactions were influenced by the foregoing considerations to the complete exclusion of sales for profit. Both profits and losses were occasioned where some of the foregoing factors were present but gains far exceeded losses over all.
 
 
 35
 However, the commissioner on the remand excluded the above quoted portion of finding 28. This indicates that although the commissioner at first believed, and inferentially found some of the transactions were influenced by the twelve listed factors "to the complete exclusion of sales for profit," he did not finally consider them nor make any separate findings with reference to them. This omission supports my conclusion that at least some, if not all, of the sales should be accorded capital gains treatment.
 
 
 36
 It is obvious that the two factors which controlled the decisions of the commissioner and the majority were the alleged frequency of sales of investments and the comparison of the income of the taxpayers from the practice of law with their income from other sources. These factors, considered separately or together, should not be dispositive of this case against the taxpayers for all of the reasons stated above.
 
 
 37
 I would enter judgment for the plaintiffs for the recovery of the taxes sued for, plus interest.
 
 NICHOLS, Judge (dissenting):
 
 38
 I respectfully dissent from the opinion of the majority.
 
 
 39
 The record reflects that the taxpayers, real estate lawyers, invested in various real properties as minority members of syndicates. They did not manage the properties. They did not, and their syndicates did not, develop, subdivide, or otherwise change the condition of the properties. They did not sell off large parcels in small lots at retail as a subdivider does. So far as appears the buyers were other investors like plaintiffs, purchasing entire buildings or comparable properties, substantially in the condition plaintiffs' syndicates had bought them, depreciation excepted. These transactions, if infrequent, would concededly be classic instances of capital investment. By some magic mere frequency is held to strip them of that character.
 
 The court has concluded that:
 
 40
 It is not necessary to make separate findings and conclusions on each separate tract where the circumstances of each have been considered and the number of properties and sales thereof is great and frequent. The normal course of taxpayers' business is not established by an individual transaction. It is the overall, factual situation that must govern a particular case. (Emphasis supplied.)
 
 
 41
 The taxpayers objected to this conclusion, and argued that even if sales were great and frequent, a taxpayer's purpose in holding real property must be determined separately as to each tract he holds, citing Tibbals v. United States, supra; Municipal Bond Corp. v. Commissioner of Internal Revenue, supra; Murray v. Commissioner of Internal Revenue, 370 F.2d 568 (4th Cir. 1967), aff'g. per curiam 24 TCM 762 (1965); and Stanley H. Klarkowski, 24 TCM 1827 (1965), aff'd (7th Cir.) 67-2 USTC ¶ 9649 (1967). On the facts of this case I agree.
 
 
 42
 In the past this court has held the factor of frequency and continuity of sales not to be a conclusive test. Oahu Sugar Company v. United States, 300 F.2d 773, 778, 156 Ct.Cl. 546, 555 (1962). Yet, great stress has been put on such factor in this case, as is evidenced by the fact that it is the only one of the numerous factors usually looked to in a case of this type that is specifically mentioned in the above quoted conclusion. It is with this conclusion, and the ramifications therefrom, that I take exception.
 
 
 43
 The gains in issue in the case at bar stem from the sale or disposal of real properties which were held for 6 months or more. The total number of separate gains being looked to is 20, or, over the 3 year period in issue, an average of somewhat less than 7 a year. The court has characterized this average number of sales as being "great and frequent." I cannot agree.
 
 
 44
 In Rollingwood Corp. v. Commissioner of Internal Revenue, 190 F.2d 263, 266 (9th Cir. 1951), an average of 400 sales a year for 2 years was held to be frequent; in Ehrman v. Commissioner of Internal Revenue, supra, an average of 153 sales a year for 2 years was held to be frequent; and in Brown v. Commissioner of Internal Revenue, supra, an average of 26 sales a year for 3 years was held to be frequent. However, in Dunlap v. Oldham Lumber Co., 178 F.2d 781, 784-785 (5th Cir. 1950), an average of 17 sales a year for 2 years was held to be infrequent; in Lazarus v. United States, 172 F.Supp. 421, 426, 145 Ct.Cl. 541, 549 (1959), this court said that an average of 23 sales a year for 4 years was "not particularly frequent;" and in Abe Pickus, 22 TCM 1791, 1796 (1963), an average of 6.4 sales a year for 10 years was held to be infrequent. Thus, I cannot see how, in the case at bar, the taxpayers' average sales being looked to for the years in issue of somewhat less than 7 a year can properly be characterized as "great and frequent." The same would hold true for all sales made during the years in issue, those averaging 17 a year. Without its finding of "great and frequent" sales, all the court is saying is that separate findings need not be made where the circumstances underlying the holding of each tract have been considered. If this were the typical subdivision case I would agree. However, it is not.
 
 
 45
 Of the cases relied upon in the commissioner's opinion, as modified and adopted by the court, I do not take issue with those indicating that no one factor is determinative of the purpose for which property is held. However, the court, in reaching its decision, has refused to apply the test, evolving from Municipal Bond Corp., supra, of viewing each property separately in order to make specific findings of fact as to each because "The circumstances in Municipal Bond Corp., do not exist here," that is, this court has not, as did the lower court in Municipal Bond Corp., misinterpret the word "primarily" as used in the statute.
 
 
 46
 In finding against the taxpayers, the court has relied mainly, indeed almost wholly, on cases involving subdivisions made by the taxpayer. Such a subdivider is essentially a retailer, and the lots he sells normally are just as much stock in trade as the inventory of a supermarket. Even so, some subdividers have obtained capital gains treatment for their sales by persuading the courts, through the infrequency of their transactions, that they were not actually in the business of retailing land. Thus courts have got in the habit of applying a frequency test, and here now it has been used in an instance of pure investment where it is grotesquely misapplied. The Municipal Bond Corp., case did not involve a subdivision and that was why it was held necessary to view each property separately, as we should have done here. (However, the Tax Court even in a subdivision case has held that a "separate look" at each tract is necessary, e. g., Stanley H. Klarkowski, supra.) It is this distinction that I deem significant, now that the definition of "primarily" has been authoritatively settled, see Malat v. Riddell, supra, and it is the circumstance that does exist in both Municipal Bond Corp., and the case at bar.
 
 
 47
 This point is not a personal invention of mine. In Frieda E. J. Farley, 7 T.C. 198 (1946), acq. 1946-2 C.B. 2, the Tax Court said (at p. 202):
 
 
 48
 * * * It is unquestionably true that the frequency and continuity with which a particular activity is carried on is a primary consideration in determining whether such activity constitutes a trade or business. It is significant to note however, that the cases which have applied this test to real estate transactions involved elements of development and substantial sales activity which are essentially lacking in this case. * * *
 
 
 49
 It will be noted that the statutory language relied on by our commissioner, in the opinion we adopt per curiam, is that of I.R.C. of 1939, Sec. 117, which excludes from capital gains treatment:
 
 
 50
 * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *
 
 
 51
 The intent of Congress must be our lodestar, and in determining that intent it is always helpful to consider what Congress actually said. The majority considers the meaning of the word "primarily", but they pass the word "customers" over in silence. I presume some sales are other than to customers, else the word is surplusage. In my semantics, the word fits the buyers of subdivision lots perfectly and the purchasers here involved not at all. However, we may assume arguendo that if a person is in a "trade or business" the persons he sells to in the ordinary course of his business are "customers." See Charles H. Black, 45 B.T.A., 204, 210 (1941), acq. 1941-2 C.B. 2. Whether mere passive investment in property in the hope it will appreciate in value is in this context a "trade or business" if extensively engaged in is, alas, something else I am not clear about. If it is, it seems to me we confront the logical absurdity that a systematically pursued intent to realize capital gains deprives one of capital gains treatment. It denies the usual rule that a person may purposely arrange his transactions, as long as they have a business purpose or other substantial economic reality, in the manner that incurs the lowest tax. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). To obtain capital gains treatment, one must make a great show of having been thinking of something else. Taxpayers here took their assigned role, attempting unsuccessfully to persuade our commissioner that they contemplated only rental income and that the realization of gains on resale came as a complete surprise to them.
 
 
 52
 This branch of the income tax laws, as interpreted, should be of great interest to those whom H. L. Mencken used to call "connoisseurs of the preposterous." I await future developments with interest and anticipation.
 
 
 53
 I would hold that in a non-subdivision case each specific tract of realty must be looked at separately, with specific findings of fact made as to each tract, to determine the nature of the gain resulting from the sale or other disposition thereof, with the test of frequency of sales, when applied to the whole, not being given the controlling emphasis it has received today.