**V. H. HUEY**

**v.**

**The UNITED STATES.**

**No. 111-72.**

United States Court of Claims.

Oct. 23, 1974.

James William Lewis, Birmingham, Ala., atty. of record, for plaintiff. Bradley, Arant, Rose & White, Birmingham, Ala., of counsel.

Richard D. Silvester, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant. Gilbert E. Andrews, Jr., Washington, D. C., of counsel.

Before DAVIS, KUNZIG and BENNETT, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on the joint motion, filed April 19, 1974, of the parties moving that the court adopt the recommended decision, filed March 19, 1974, by Trial Judge Harry E. Wood, pursuant to Rule 134(h), as the basis for its judgment in this case and to enter a judgment in this proceeding in accordance therewith. Upon consideration thereof, without oral argument, since the court agrees with the said recommended decision, as hereinafter set forth, it hereby grants the joint motion of the parties and adopts the decision as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is entitled to recover in accordance with the trial judge's recommended decision and judgment is entered for plaintiff accordingly with the amount thereof to be determined in further proceedings pursuant to Rule 131(c).

## OPINION OF TRIAL JUDGE

WOOD, Trial Judge: In this action to recover federal income taxes, and self-employment taxes, paid for the years 1966 and 1967, the main issue is whether certain lands sold by plaintiff in each of those years were "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business", within the meaning of Section 1221(1) of the Internal Revenue Code of 1954.[1] If so, plaintiff's gains from such sales are not capital gains, as he asserts, but are, rather, ordinary income.

The parties agree that the determination whether plaintiff's said gains are ordinary income or capital gains will also govern the subsidiary question whether, during 1966 and 1967, plaintiff carried on the "trade or business" of selling real estate, and is therefore liable for self-employment taxes under Section 1402.[2] There is also a separate issue whether or not plaintiff is entitled to a "retirement income" credit under Section 37.

For reasons hereinafter appearing, it is concluded that plaintiff is entitled to recover on each of the issues defined hereinabove, with the amount of his recovery to be determined pursuant to Rule 131(c).

### I

#### The Sales of Land in 1966 and 1967

Plaintiff, a resident of Birmingham, Alabama, was born in 1900. About 1941, after obtaining a real estate broker's license from the State of Alabama, he went into business for himself under the name "Huey Realty Company". He also developed an insurance business, which he sold in 1954.

For some years prior to, and during, 1966 and 1967, plaintiff rented desk

1. "§ 1221. Capital asset defined.
   "For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
   "(1)  *  *  *  property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;
   *  *  *  *  "

2. All statutory references herein are to the 1954 Code.

space in the office of Insurers Exchange. For both 1966 and 1967, the Birmingham alphabetical telephone directory carried listings for "V. Hain Huey, rl est", and "Huey Realty Co", and for both years the Birmingham classified telephone directory listed, under the heading of "Real Estate", "Huey Realty Co". Until the Insurers Exchange (and plaintiff) moved from one location to another in Birmingham about 1967, a sign bearing the words "Huey Realty Company" appeared on the window of the building in which plaintiff had desk space.

As a matter of financial caution, plaintiff maintained his state broker's license and a City of Birmingham real estate license to and after 1967. He deducted the annual cost of these licenses as a business expense on his federal income tax returns. He made no brokerage sales in or after 1966, however, and he did not actively solicit any brokerage business after 1961. He had partially retired by 1966, and the bulk of his time in 1966 and 1967 was spent in research and writing for publication, and in selling and servicing insurance policies.

In 1949 plaintiff purchased, from a seller who would not sell less than all of the tract, 720 acres of land in Shelby County, Alabama. The land, in a rural and largely unpopulated area, and then about 18 miles by road from Birmingham, ran along and straddled New Hope Mountain. Plaintiff's purpose in acquiring the land was to use the central portion of the tract, at some future time, as the site of a summer or health resort.

Not all of the acreage was contiguous. Portions of the tract, totaling 360 acres, did not adjoin the remaining acreage. By 10 further purchases, nine in or prior to October 1957, and one of 5 acres in July 1962, plaintiff acquired at least 266 additional acres in Shelby County, thus becoming the owner of a tract of at least 866 acres of contiguous mountain-top properties and an additional 125 acres near, but not adjoining, that acreage. Plaintiff's Shelby County land was known as, and is here called, the Acreage Tract.

Although a fairly good road traversed the Tract at each of its outer extremes, the Tract was, when purchased, essentially raw mountain land, as a whole largely inaccessible to vehicular traffic. Plaintiff neither subdivided nor platted the Tract, nor did he have utilities extended to it, build sidewalks or curbs, or make any other subdivision-type improvements. In 1955 he had pine trees planted on the Tract, at a cost of some $6,400, and in 1958 he had a water well drilled on it, at a cost of about $2,500, but neither the tree planting nor the water well drilling took place on land sold in 1966 or 1967.

Commencing in 1957, and continuing to 1964, plaintiff gradually cut and built a paved road through the entire Acreage Tract at a total cost of some $65,000. In essence, the road divided the Tract along its longest axis.[3]

Land at either end of the Tract was, as noted, fairly accessible by automobile and was not essential to the effectuation of plaintiff's health resort plans. Accordingly, at or about the same time in 1957 that he began to cut and build the road, plaintiff also began to sell parcels from either end of the Tract in order to obtain cash with which to cut and build the road. Obtaining cash for future construction of his health resort was also a consideration.

After his initial decision to sell portions of the Acreage Tract, plaintiff's effort to sell his land, in parcels as large as possible, was made in part by signs, some 8 inches by 20 inches and some 10 inches by 14 inches, stating that "Acreage Tracts" were "For Sale", and bearing plaintiff's name and business telephone number. Several such signs were posted along plaintiff's road through the Tract for a time. In 1966 and 1967, however, no signs were posted on the portions of the Acreage Tract

3. At least at some points, plaintiff's land extended as much as 1500 feet from the road.

plaintiff still owned. In those years, two signs substantially identical in content to those just described were located on portions of the Tract sold by that time, and one other such sign was placed at a nearby street intersection.

In his effort to sell the Acreage Tract, plaintiff also ran a total of 540 newspaper advertisements, all but one of which appeared in the Birmingham News, during the period February 1958 to June .21, 1964. The lines per ad varied from a high of 30 to a low of 6, but averaged about 7.3 lines per ad overall. In 1958, 1959, and 1960, plaintiff averaged 53 ads per year. In 1961 and 1962 he averaged 142 ads per year. In 1963 he ran 72 ads, and between January 1 and June 21, 1964, he ran 15 ads. He did not place any ads after the latter date.

Sales of portions of the Acreage Tract were infrequent. In 1957, and again in 1962 and 1963, plaintiff made only one sale of a parcel in that Tract. In 1958 and 1961 he made none. In other years between 1957 and 1968 he sold as many as five parcels in only 2 years,[4] and he usually sold less than four parcels in any single year. The Acreage Tract was ultimately sold, in a total of 27 transactions, between 1957 and 1968, in parcels ranging from 4.5 acres (in 1966) to 200 acres (in 1959). Plaintiff represented himself in all such sales transactions.

In 1966 and 1967, plaintiff spent about 30 to 40 hours per year on the Acreage Tract. He sold five parcels from the Acreage Tract in 1966, and four in 1967. He had acquired all of the acreage sold in those years in 1949. The 1966 sales occurred between January 31 and March 26 of that year, and the 1967 sales occurred between February 2 and February 15 of that year. While, as noted, the only improvement to the parcels sold in 1966 and 1967 was the portion of the road which went past the property, the cost of the road allocable to each of the parcels sold in 1966 and 1967 considerably exceeded the "proportionate purchase price" of the respective parcels.[5]

Certain other facts should also be noted at this point. One is that, in 1959, and again in 1967, plaintiff underwent surgery for the removal of growths (the first from his jaw, and the second from his mouth) subsequently determined to be malignant. The record does not establish any real connection between plaintiff's malignancies and his sales, however. The proof is that plaintiff still owned the contemplated site for his health resort in both 1966 and 1967,[6] and that he did not completely give up the idea of building his health resort until about 1968.

The basic problem is "old, familiar, recurring, vexing and oft-times elusive * * *." Thompson v. Commissioner, 322 F.2d 122, 123 (5th Cir. 1963). As the court held in Cross-White v. United States, 369 F.2d 989, 991, 177 Ct.Cl. 671, 672–673 (1966), the starting point for its resolution is:

> * * * the recognized principle that the "benefit" of capital gains treatment connotes no more than the term itself—an exception to the normal tax structure. "[T]he definition of a capital asset must be narrowly applied and its exclusions interpreted broadly." * * * The statutory scheme of Section 1221 contemplates a distinction between appreciation in the value of property which accrues with the passage of time and profits and losses which arise from the regular conduct of a business venture. * * * [Citations omitted.]

---

4. Because of his understanding of Section 1237 of the Code, plaintiff intentionally limited sales of parcels of land which he owned to not more than five per year.

5. In fairness, closing costs in connection with the sales approached or exceeded the "proportionate purchase price" of a parcel sold.

6. Plaintiff did discuss the possibility of selling the Acreage Tract (or a substantial portion of it) with more than one person, albeit precisely when is not clear.

Also to be recognized at the outset is that plaintiff has the burden of proving a right to capital gains treatment. *Ibid.*

■■ A dealer in real estate may, of course, hold real property for investment rather than primarily for sale to customers in the ordinary course of his trade or business. Municipal Bond Corp. v. Commissioner, 382 F.2d 184 (8th Cir. 1967); see also Tibbals v. United States, 362 F.2d 266, 176 Ct.Cl. 196 (1966). Whether plaintiff had profits and losses arising from the everyday operation of a business, or gains from realization of an appreciation in value over a substantial period of time, is basically a question of fact.

■ The holdings of this and other courts teach that the only principle of universal application in a case such as this is that no single test applies to all of them, but that the purposes for which the land was acquired, the motive for selling, the extent of improvements made to facilitate sales, the frequency and continuity of sales, the method employed in selling, income from sales as compared to the taxpayer's other income, and the time and effort expended by the taxpayer in promoting sales, are among the factors which may be helpful in resolving a particular case. Goodman v. United States, 390 F.2d 915, 182 Ct.Cl. 662, cert. denied, 393 U.S. 824, 89 S.Ct. 87, 21 L.Ed.2d 96 (1968); Miller v. United States, 339 F.2d 661, 663, 168 Ct.Cl. 498, 504 (1964); Lazarus v. United States, 172 F.Supp. 421, 145 Ct.Cl. 541 (1959).

A number of those factors strongly support plaintiff. The land he sold in 1966 and 1967 had been acquired nearly two decades theretofore, primarily for use as a health resort. No improvements at all were made to the Acreage Tract for several years following acquisition. The sole improvements ever made consisted of planting pine trees, a water well, and a road through virtually inaccessible property, and only the road related to the land sold in 1966 and 1967.

Moreover, plaintiff's decision, in 1957, to sell portions of the Acreage Tract was largely motivated by his desire to obtain cash for road construction and toward future health resort construction.[7] His sales activities were never extensive, and during the years in issue were confined to having three "For Sale" signs posted near the property. Moreover, sales in and after 1957 were plainly neither frequent nor continuous, and plaintiff, semi-retired in 1966 and 1967, spent very little time on the Acreage Tract. Finally, there is no suggestion that profits from 1966 or 1967 sales were applied to the purchase of other real property. *Cf.* Lazarus v. United States, *supra.*

Not surprisingly, defendant urges other factors as requiring a contrary conclusion. It argues, among other things, that the "proportionate purchase price" of each of the several parcels sold in 1966 and 1967 was far less than the cost of the "improvement" (*i. e.,* the road) allocable to each such parcel; and that a large percentage of plaintiff's income in those years was attributable to real estate activities.

According to defendant, plaintiff's purpose in holding the Acreage Tract in 1966 and 1967 was to sell it, piecemeal, and over several years, as a retirement income. Defendant concedes that plaintiff's sales activities and efforts in 1966 and 1967 were minimal, but asserts that this factor is here insignificant, and notes that in Huey v. United States, 24 A.F.T.R.2d 5925 (N.D.Ala.1969), a jury determined that plaintiff's gains from sales of land in the Acreage Tract during 1964 and 1965 constituted ordinary income.

The 1969 jury verdict against plaintiff is not, and could not properly be, relied upon by defendant as governing this litigation. Whatever facts may have

---

7. It should be borne in mind, however, that plaintiff completed his road construction in 1964.

been before the District Court, this case is to be decided on the record presented to this court. And, on those facts defendant's arguments are unpersuasive.

The land that plaintiff sold in 1966 and 1967 had been purchased in 1949, and was, when acquired, essentially raw mountain acreage. Closing costs for sales in those years at least approached, and in many instances exceeded, the "proportionate purchase price" of the land sold. · In the circumstances, attributing significance to the extent to which the cost of an improvement allocable to a particular parcel sold exceeded its cost of acquisition is unjustified.

Nor is the fact that plaintiff's income in 1966 and 1967 was largely attributable to real estate of great moment. In those years plaintiff was over 65 years old and in semi-retirement. His time was largely devoted to research and writing for publication, and to selling and servicing insurance policies, and his total income, from all sources, was less than $15,000 in 1966 and less than $18,000 in 1967.

█ The real question is not whether plaintiff hoped to realize profit from any sale of a parcel in the Acreage Tract during 1966 or 1967, nor whether he supported himself (and Mrs. Huey) during his retirement years by such profits, but whether or not he held the land sold in 1966 and 1967 "primarily for sale to customers in the ordinary course of his trade or business." While that question is seldom easy to answer, it is concluded that plaintiff in this cause has satisfactorily proven that he did not so hold the land. Accordingly, he is entitled to recover on the capital gains issue.

The parties have agreed that resolution of the capital gains issue is determinative as to the self-employment tax issue for 1966 and 1967. Thus, plaintiff is also entitled to recover on the latter issue.

## II

### The Retirement Income Credit

It is stipulated that the Internal Revenue Service disallowed the retirement income credit claimed by plaintiff for both 1966 and 1967. While defendant accurately characterizes plaintiff's argument respecting such denial as "almost by way of a postscript," [8] there is no doubt that plaintiff has sufficiently raised the retirement income credit issue. Indeed, as will be seen, defendant does not contend otherwise.

In substance, Section 37(a) provides that an individual "who has received earned income before the beginning of the taxable year" is entitled to a tax credit of 15 percent of the individual's "retirement income".[9] Section 37(b) provides that an individual "shall be considered to have received earned income if he has received, in each of any 10 calendar years before the taxable year, earned income * * * in excess of $600 * * *." Section 37(g) defines "earned income", by reference to Section 911(b), as "wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered * * *."

Defendant's sole argument on this phase of the matter is that plaintiff has failed to show that he had "earned income" in excess of $600 in any 10 of the years preceding 1966, and thus has failed to prove he meets the statutory requirements for retirement income credit. This view of the record is too technical and narrow.

The evidence does not reflect the exact amount of plaintiff's income for any years other than 1966 and 1967. It does show, however, that plaintiff entered the real estate business as a salesman in 1921 or 1922, that he went into the real estate business for himself in 1941, that he thereafter also developed an insurance business, that his real estate bro-

---

8. Defendant's Brief, p. 20.

9. Section 37(c) defines "retirement income" for those, like plaintiff, more than 65 years old.

kerage business was fairly successful, and that he made a fairly good living most of the time.

■ In this state of the record, plaintiff asks that the trial judge infer from the record as a whole that he meets the "earned income" requirements in question. Where a fact is clearly and readily susceptible of direct proof, this practice is not to be viewed with enthusiasm or approval, nor is it free from risk. The validity of the inference sought seems clear, however, and in the interests of justice the making of a finding that plaintiff had the requisite "earned income" is deemed warranted. Accordingly, plaintiff is also entitled to recover on the retirement income credit issue.

### FINDINGS OF FACT

#### Background Facts

1. (a) Plaintiff in this action sues to recover federal income taxes assessed against him for the years 1966 and 1967, and paid, in the amounts of $1,726.43 and $2,536.44, respectively, and self-employment taxes assessed against him for the years 1966 and 1967, and paid, in the amounts of $405.90 and $422.40, respectively, plus deficiency interest paid and statutory interest as provided by law.

(b) Trial of this cause has been limited to the issues of law and fact relating to plaintiff's right to recover, reserving determination of the amount of recovery, if any, for further proceedings.

2. (a) Plaintiff, a resident of Birmingham, Alabama, was born October 23, 1900. He began to receive social security benefits in May 1964.

(b) Plaintiff's late wife, Lucile C. Huey, passed away August 21, 1970. Mrs. Huey had no income during the taxable years here involved. She signed a request for joint federal income tax computation for 1966, and a joint federal income tax return for 1967, solely for the purpose of obtaining the benefit of joint federal income tax rates. Plaintiff is duly entitled to receive the full amount of any refund of taxes and interest due herein.

(c) Plaintiff timely filed an individual federal income tax return for the year 1966. A request for joint federal income tax computation for that year, signed by plaintiff and his wife, was granted by the Internal Revenue Service. Plaintiff and his wife timely filed a joint federal income tax return for the year 1967.

(d) The tax assessments described in finding 1(a) resulted from determinations of the Internal Revenue Service that for both the years 1966 and 1967 (1) plaintiff's gain from the sale of certain real property was ordinary income rather than long-term capital gain, as reported, and (2) that plaintiff was a self-employed real estate dealer liable for self-employment taxes. The parties have stipulated that the Service also disallowed the retirement credit claimed by plaintiff for such years.

(e) Plaintiff's timely claims for refund of the taxes assessed against him for the years 1966 and 1967, as described in finding 1(a), were denied by the Service March 8, 1972. This action followed.

#### Plaintiff's History

3. (a) About 1921 or 1922, plaintiff was employed in the rental department of a real estate firm, and in 1926 he became a salesman for that firm. Sometime between 1935 and 1940 he received from the State of Alabama a real estate broker's license. About 1941 he went into business for himself, under the name "Huey Realty Company". His brokerage business, which dealt largely with locating purchasers for, or sellers of, small business and industrial sites, was fairly successful, and he made a good living most of the time.

(b) After going into the real estate business for himself, plaintiff also developed an insurance business. In 1954, plaintiff sold his insurance business to A. R. Dearborn & Company, Realtors. Real estate brokerage is an individual,

personal, service performed by the broker for his client, and the sale to Dearborn did not include plaintiff's brokerage business. To facilitate the keeping in force of insurance policies he had sold prior to 1954, however, plaintiff did agree to work for Dearborn for a time.

(c) In 1956 plaintiff left Dearborn and rented desk space in the office of Insurers Exchange. Plaintiff had no employees and no real connection with Insurers Exchange except that the Exchange wrote up any policies of insurance plaintiff sold. For the years 1956–58, 75 to 85 percent of plaintiff's time was devoted to his real estate business.

(d) The Birmingham alphabetical telephone directory for 1966 carried listings for "V. Hain Huey, rl est", and "Huey Realty Co", with the address and telephone number of Insurers Exchange, and Exchange employees took calls for plaintiff. The Birmingham classified telephone directory for 1966 also listed "Huey Realty Co" with that address and telephone number under the heading "Real Estate". Plaintiff paid $3.20 per month for the three listings and deducted this (and other expenses) as business expenses on his federal income tax returns for 1966 and 1967.

(e) From 1956 to sometime in 1966 or 1967, there was in the front window of the building in which the Exchange was located a painted sign bearing the words "Huey Realty Company".

(f) About 1967, Insurers Exchange moved its offices from North 22nd Street, Birmingham, to the sixth floor of an office building on 4th Avenue North, also in Birmingham. Plaintiff continued to rent space from the Exchange at its new offices and the Birmingham alphabetical and classified telephone directories for 1967 listed plaintiff (and Huey Realty Company) at the Exchange's telephone number and new address, as had the 1966 directories. Plaintiff was uncertain whether or not "Huey Realty Company" was listed on the office building directory in the lobby. In 1968 the telephone directory listings for "Huey Realty Co" were discontinued at plaintiff's request.

(g) In 1966 and 1967, plaintiff was partially retired. The bulk of his time was devoted to research and writing for publication, and to selling and servicing insurance policies. He spent about 30 to 40 hours each year on the Acreage Tract to be described (finding 6). Despite any medical problems he may have had (see finding 3(h)) plaintiff led an active life. In 1966 he drove his car 7,211 miles, of which 5,049 were business-related, and in 1967 he drove his car 6,880 miles, of which 4,128 were business-related.

(h) In 1959 plaintiff underwent surgery for a growth (subsequently determined to be malignant) at the back of his right lower jaw, and in 1967 a growth (also malignant) was removed from the upper palate of his mouth.

4. (a) As a matter of financial caution, plaintiff retained his real estate business license from the City of Birmingham until 1968, and his state brokerage license (see finding 3(a)) until 1969, but he made no brokerage sales after 1965, and he did not actively solicit any real estate brokerage business after 1961.[10]

(b) Plaintiff deducted the annual cost of his broker's and city business licenses ($98.50 per year) as a business expense on his federal income tax returns for 1966 and 1967.

(c) On leaving Dearborn in 1956 (finding 3(c)), plaintiff dropped his real estate business licenses in the Cities of Homewood and Mountain Brook, Alabama. Plaintiff has never had a business license to sell real estate in Shelby County, Alabama (see findings 6(a), 8(c), *infra*).

5. (a) From 1956 to trial in 1973, plaintiff made a total of 43 brokerage

10. Between 1961 and 1965, plaintiff made some brokerage sales as favors or accommodations for old customers. See also findings 3(d)–(f).

sales, 33 of which were made prior to 1963, and all of which were made prior to 1966.

(b) From 1949 to trial in 1973, plaintiff sold a total of 41 tracts of real property owned by him. During that period he intentionally limited such sales to no more than five per year because of his understanding of Section 1237 of the Internal Revenue Code. On two occasions he intentionally delayed the sale of a tract he owned until the following year. Usually, plaintiff made less than four such sales per year, and in only 2 years were five such sales made. In 1953, 1956, 1958, 1961, and the years 1969–73, plaintiff made no such sales. For each of the years 1949, 1950, 1955, 1957, 1962 and 1963, he made only one such sale. Except for one sale in 1964 and one in 1968, all of such sales in and after 1957, were of portions of the "Acreage Tract" (see finding 6(a), *infra*).

(c) Plaintiff always represented himself in sales of land he owned, but from time to time a real estate agent did solicit buyers for plaintiff's land and act on their behalf in sales transactions. At no time did plaintiff retain an independent real estate broker and assign him the task of completely liquidating all of plaintiff's real property.

*Acquisition of, and improvements to, the Acreage Tract*

6. (a) On April 15, 1949, plaintiff purchased, from a seller who would not sell less than all of the property, 720 acres of land in Shelby County, Alabama, running along and straddling New Hope Mountain. The acreage was situated in a rural and largely unpopulated area, and was then about 18 miles, by road, south of Birmingham.[11] Not all of the acreage was contiguous. Portions of the tract, comprising a total of 360 acres, did not adjoin the remaining acreage. Plaintiff's purpose in acquiring the land was to use the central portion of it, sometime in the future, as the site of a summer or health resort. Between April 15, 1949 and October 1957, through nine further purchases, plaintiff acquired at least 266 additional acres of land in Shelby County, and in July 1962 he purchased an additional 5-acre tract in Shelby County. Plaintiff thus put together a tract of at least 866 acres of contiguous mountaintop properties, and an additional 125 acres near, but not adjoining, the large tract. The combined acreage was known as, and is herein referred to as the Acreage Tract.[12]

(b) The several properties comprising the Acreage Tract were, when purchased, essentially raw mountain land. In two places, at the outer extremes of the Tract, fairly good roads crossed it, trails existed through the woods on the Tract, and "country", "logging", or "old" roads traversed portions of the property. As a whole, however, the Tract was largely inaccessible to vehicular traffic.

(c) Valleys at the foot of New Hope Mountain near the Acreage Tract, have an elevation of about 500 feet. On the Tract, the mountain varies in elevation from 600 to 740 feet. The north side of the mountain is very steep. Plaintiff was unable to get permission from property owners on the south side of the mountain to cross their land for access to his.

7. (a) The Acreage Tract was never subdivided or platted by plaintiff in any manner whatever, nor did he have utilities extended to the property. Plaintiff did not build sidewalks or curbs, or make any other subdivision-type improvements on the Tract.

(b) In 1955 plaintiff spent $6,394.84 for clearing and planting pine trees on the Acreage Tract. In 1958 a water

---

11. The road distance from Birmingham is now about 14.5 miles.

12. The parties have stipulated that the Acreage Tract included 991 acres. A joint exhibit reflects, however, that plaintiff's purchases for that Tract totaled 1023 acres. For present purposes, the discrepancy is of little or no significance.

well was drilled, at a cost of $2,500, on the Tract. Neither the pine trees nor the water well were located on portions of the Tract sold during the years here in issue.

(c) Commencing in 1957, and continuing each year through 1964, plaintiff gradually cut and built a road (paved when completed) through the entire Acreage Tract. In essence, the road divided the Tract along its longest axis. The total cost of the road (including survey costs) was approximately $65,000. At least at some points on the Tract, plaintiff's land was as much as 1500 feet from the road.

(d) The only improvement to portions of the Acreage Tract sold during the years here in issue was the road through the Tract. On the average, the cost of the road allocable to each of the nine portions sold in 1966 and 1967 (including, in accordance with the stipulation of the parties, sale closing costs), considerably exceeded the "proportionate purchase price" of each such portion of the Tract. More specifically, with respect to the parcels sold in 1966 and 1967, the value of improvements, as compared to a total basis (including closing costs) of 100 percent, results in the following percentages:

|  | Proportionate Purchase Price (Percent) | Closing Costs (Percent) | Improvements (Percent) |
|---|---|---|---|
| **1966 Sales:** | | | |
| Tract 1 | 4.8 | 4.1 | 91.1 |
| Tract 2 | 4.6 | 5.2 | 90.2 |
| Tract 3 | 8.4 | 5.3 | 86.3 |
| Tract 4 | 5.1 | 3.2 | 91.7 |
| Tract 5 | 8.2 | 6.6 | 85.2 |
| **1967 Sales:** | | | |
| Tract 1 | 7.0 | 51.0 | 42.0 |
| Tract 2 | 4.4 | 3.2 | 92.4 |
| Tract 3 | 3.3 | 20.7 | 76.0 |
| Tract 4 | 2.6 | 24.8 | 72.6 |

*Sales of portions of the Acreage Tract*

8. (a) As noted (finding 6(a)), plaintiff's initial purchase in connection with the Acreage Tract of 720 acres had resulted from the seller's refusal to sell less than all of the seller's acreage in Shelby County. That purchase, and subsequent ones to form a chain of contiguous mountaintop properties, had resulted in plaintiff's ownership in the Acreage Tract of more land than his contemplated health resort (which plaintiff planned to locate on the central portion of the Tract) would require if built.

(b) Land at both ends of the Acreage Tract was fairly accessible to vehicular traffic, and the effectuation of plaintiff's health resort plans would not have depended on his retention of such land. Accordingly, about the same time that plaintiff began to cut and build a road across the Acreage Tract in 1957, he also began to sell off parcels of land from either end of the Tract, in order to obtain cash with which to cut and build the road. Obtaining cash for future construction of his health resort was also a consideration. *Cf.* finding 11(a), *infra.*

(c) The Acreage Tract was ultimately sold in a total of 27 parcels over a period of some 11 years (1957–68). The central portion of the Tract was retained by plaintiff until 1968. The smallest parcel sold was 4.5 acres, sold in 1966; the largest was 200 acres, sold

in 1959. In 12 of the sales, an independent real estate agent handled the transaction for the purchaser and received a full real estate commission. As noted, plaintiff always represented himself in the sales of such land.

9. (a) After deciding to sell parts of the Acreage Tract, plaintiff's effort to sell his land, in the largest parcels possible, was made by (1) signs, and (2) newspaper advertising.

(b) From three to five arrow-shaped signs measuring 8 inches by 20 inches were posted along plaintiff's road through the Tract. The signs stated that "Acreage Tracts" were "For Sale", and bore plaintiff's name and business telephone number. Additionally, several rectangular-shaped signs measuring 10 inches by 14 inches were placed at various points along the road. The rectangular signs contained the same information as the arrow-shaped signs, albeit in slightly different order.

(c) Plaintiff placed newspaper advertisements in connection with his effort to sell the Acreage Tract from February 1958 to June 21, 1964. During this period plaintiff ran a total of approximately 540 newspaper ads, all but one of which appeared in the Birmingham News. In 1958, 1959, and 1960, the number of ads averaged 53 per year. In 1961 and 1962, the number of ads averaged 142 per year. In 1963 plaintiff ran 72 ads, and between January 1, 1964 and June 21, 1964, he ran 15 ads. The lines per ad varied from a high of 30 to a low of six, but averaged about 7.3 lines per ad overall.

(d) During the taxable years here in issue, plaintiff did not advertise the portion of the Acreage Tract which he still owned in any newspaper, nor were any signs placed on that portion of the Tract. Three arrow-shaped signs, one located at a nearby street intersection and two located on a portion of the Tract plaintiff had previously sold, were, however, used. It is reasonable to conclude that the signs in use in 1966 and 1967 were substantially indentical in content to those described in finding 9(b).

(e) While plaintiff's signs were on the property he received an average of 40 to 50 calls per year from prospective purchasers of parcels in the Acreage Tract. Only a small fraction of such calls required that plaintiff show the property, because some callers were represented by agents and others were not sufficiently interested to see it. Plaintiff made about 12 trips per year to the Acreage Tract in 1966 and 1967 to show it to prospective purchasers.

(f) Plaintiff discussed the possibility of selling the entire Acreage Tract (or a substantial portion of it) with Mr. Newman Waters and others, albeit precisely when is unclear.

10. (a) During the period January 31–March 26, 1966, plaintiff sold five tracts of land, of varying acreage, totaling about 74.36 acres, and all part of the Acreage Tract in Shelby County. All of the land sold in 1966 had been acquired by plaintiff on April 15, 1949.

(b) During the period February 2–15, 1967, plaintiff sold four tracts of land, of varying acreage, totaling approximately 34.75 acres, and all part of the Acreage Tract in Shelby County. Some 24.6 acres of the land sold in 1967 had been acquired by plaintiff on April 15, 1949, and 10.15 acres of such land had been acquired by him on May 18, 1949.

(c) On one occasion, perhaps in 1966 or 1967, plaintiff declined to give an exclusive listing on his Acreage Tract to a then inexperienced real estate agent in Shelby County who was eager to find listings of property for sale. On one occasion, plaintiff declined an offer from a real estate developer who had successfully promoted a valley subdivision development adjacent to portions of the Acreage Tract to develop some of plaintiff's land. Had plaintiff enlisted the services of a real estate agent or a specialist in development of real property, he probably could have sold land more quickly than he did. Had plaintiff

himself wished to do so, however, he probably could have sold land more quickly than he did.

11. (a) Plaintiff "saw that it wasn't possible, or begin [sic] to see that it wasn't possible * * *" for him to build a health resort on the portion of the Acreage Tract he still owned about 1962. While plaintiff testified that he "actually didn't give it up until 1968", and that his early sales were for the purpose of facilitating his intent to build a health resort on the Tract, there is no evidence in the record of any real action by plaintiff, either before or after 1962, toward actual construction of such a resort. The parcels of land sold in 1966 and 1967 were not on the site originally contemplated by plaintiff for use as the location of his health resort.

(b) While plaintiff suffered malignancies in 1959 and again in 1967, the proof fails to support any conclusion that his sales of land within the Acreage Tract represented a liquidation of an investment in consequence of his health problems.

12. Plaintiff capitalized surveying and closing costs in connection with, and the costs of road construction allocable to, parcels of land in the Acreage Tract which he sold in 1966 and 1967.

13. From and after his acquisition of the Acreage Tract in 1949, plaintiff attempted to keep the Tract entirely separate from his brokerage business.

14. The record establishes that plaintiff did not utilize the proceeds from the sale of portions of the Acreage Tract during the years here in issue for purchase of other real estate.

*Plaintiff's Income*

15. (a) During the years 1966 and 1967, plaintiff's income, as reported on his federal income tax returns for those years, was derived from several sources. The sources, and the amounts and percentages, of such reported income for the said years are as follows:

| | *1966* | | *1967* | |
| *Source* | *Amount* | *Percent of Total* | *Amount* | *Percent of Total* |
| Income not connected with sales of land | $2,395.36 | 16.28 | $3,341.67 | 18.88 |
| Profit: current sales | 6,066.65 | 41.23 | 2,854.36 | 16.13 |
| Profit: installment sales | 2,536.89 | 17.24 | 7,163.94 | 40.48 |
| Interest: real estate mortgages | 3,714.39 | 25.26 | 4,337.53 | 24.51 |
| Total | $14,713.29 | 100.00 | $17,697.50 | 100.00 |

(b) For 1967, plaintiff and his late wife reported a total of $1,720.80 "received as pensions or annuities under the Social Security Act, the Railroad Retirement Acts, and certain other exclusions from gross income." While plaintiff received social security benefits in 1966, the amount so received is not ascertainable from the evidence.

16. The evidence does not establish the exact amount of plaintiff's income for any years other than 1966 and 1967. It is reasonable to conclude from the record as a whole, however, that plaintiff had "earned income", within the meaning of Section 37 of the Internal Revenue Code, in excess of $600 in each of the 10 calendar years prior to the taxable years here in issue.

CONCLUSION OF LAW

Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to re-

cover and judgment is entered to that effect. Absent a stipulation of the parties as to the amount of recovery due plaintiff, that amount is to be determined in further proceedings pursuant to Rule 131(c).