T.C. Memo. 1997-71

UNITED STATES TAX COURT

THOMAS B. DRUMMOND, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16958-94.                    Filed February 10, 1997.

<u>William F. Krebs</u> and <u>Mark E. Kellogg</u>, for petitioner.

<u>Susan T. Mosley</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined the following

deficiencies in, additions to, and accuracy-related penalties on

petitioner's Federal income tax:

| Year | Deficiency | Additions to Tax Sec. 6651(a)(1)[1] | Accuracy-Related Penalties Sec. 6662(a) |
|------|-----------|--------------------------------|----------------------------------|
| 1989 | $23,141.00 | $1,053.80 | $5,544.00 |
| 1990 | 30,954.00 | 7,738.47 | 5,340.60 |
| 1991 | 25,657.00 | -- | 4,778.20 |

---

[1]  All section references are to the Internal Revenue Code (Code)
in effect for the years at issue.  All Rule references are to the
Tax Court Rules of Practice and Procedure.

The issues remaining for decision are:

(1) Was the drawing that petitioner sold during 1989 "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" within the meaning of section 1221(1)? We hold that it was not, and we further hold that the gain that petitioner realized from the sale of that drawing is long-term capital gain.[2]

(2) Did petitioner engage in his horse activity during 1989, 1990, and 1991 and his cattle activity during 1990 and 1991 with the objective of making a profit within the meaning of section 183? We hold that he did not.

(3) Is petitioner liable for 1989 and 1990 for the addition to tax under section 6651(a)(1)? We hold that he is not for 1989 and that he is for 1990 to the extent stated herein.

(4) Is petitioner liable for 1989, 1990, and 1991 for the accuracy-related penalty under section 6662(a)? We hold that he is to the extent stated herein.

---

[2] The parties agree that the Court's holding on the characterization of petitioner's gain from that sale will be dispositive of the remaining issues presented under secs. 404(h)(1)(C) and 4972(a).

FINDINGS OF FACT[3]

Some of the facts have been stipulated and are so found.

Petitioner resided in The Plains, Virginia, at the time the petition was filed.

During all relevant periods, petitioner, who holds a bachelor's degree in philosophy, a master's degree in clinical psychology, and a Ph.D. degree in psychology, practiced as a psychologist and his income from that practice provided his support. Throughout the years at issue, petitioner devoted an average of 58 hours a week to his psychology practice.

From the late 1970's through sometime in 1987, petitioner served as a director of several mental health clinics that are part of the Prince George's County, Maryland, health system. From sometime in 1987 through 1989, petitioner practiced as a psychologist at the Saint Luke Institute, a private psychiatric hospital in Suitland, Maryland. From 1988 through 1994, petitioner provided psychological testing and counseling services under the name Psychological Testing Services. From 1989 through 1994, petitioner provided psychological services at the New Life

---

[3] At the conclusion of the trial herein, the Court ordered the parties to file simultaneous opening and answering briefs. Both of petitioner's briefs failed to comply with Rule 151(e)(3). For example, petitioner's opening brief did not contain proposed findings of fact as required by that Rule. However, his answering brief contained what amounted to proposed findings of fact to which respondent did not have the opportunity to object. Consequently, we did not use the proposed findings of fact contained in petitioner's answering brief as an aid in finding the facts in this case.

Center (New Life Center), a residential center for psychiatric patients, which he and another psychologist founded in March 1989.

The Drawing in Question

During the 1970's, petitioner, who at all relevant times has had an interest in and enjoyed art, purchased at least six drawings through auctions, galleries, or private sales, including one entitled "Three Feminine Heads" (drawing in question) that he purchased during the early 1970's for $1,300 from a gallery in Washington, D.C., and that had been attributed to the artist Michelangelo Anselmi (Anselmi).  When petitioner acquired those drawings, he did not intend to sell them.  Drawings of the type that petitioner purchased had often been used by their respective artists as models for their own paintings, sculptures, and/or frescos.

Petitioner conducted research throughout the 1970's and into the 1980's on the drawings that he had acquired during the 1970's.[4]  As a result of that research, petitioner concluded that certain drawings of the type that he had purchased either were not attributed to particular artists or were attributed, as was subsequently determined was the case with the drawing in ques-

---

[4]  For example, petitioner asked certain experts at the National Gallery of Art in Washington, D.C. (National Gallery) to ascertain whether the drawings that he had acquired were structurally sound, that is to say, whether they were on acid-producing paper, which would eventually deteriorate.  There are inconsistencies in the record as to when petitioner undertook such research.

tion, to the wrong artists and that art museum curators knowledgeable about both museum and privately-owned art collections were qualified to determine the artists of such drawings.

Around the early 1980's, based on a visual comparison of the drawing in question with drawings properly attributed to Anselmi, petitioner became convinced that Anselmi had not sketched that drawing; the curator of Italian drawings at the National Gallery (curator of Italian drawings) became interested in the drawing in question; that curator advised petitioner that she was fairly certain that the drawing in question was attributable to a follower of Correggio, who worked, as did Correggio, in Parma, Italy, during the 16th century; petitioner lent that drawing to the National Gallery; and the curator of Italian drawings conducted research on it and attributed it to a follower of Correggio named Franco Parmagianino (Parmagianino).

For some undisclosed period of time after the drawing in question was attributed to Parmagianino, the curator of Italian drawings caused the drawing in question to receive international exposure by having it displayed in art exhibits at the National Gallery and in Parma, Italy. During that period, that drawing also received international exposure through newspaper articles about it in the United States and Italy and photographs of it in museum art catalogues.

During 1988 or 1989, Christie's Auction House in New York City (Christie's) advised petitioner that the drawing in question

could be sold at auction for approximately $100,000 and expressed an interest in auctioning it on his behalf.[5]  At or about the same time, the curator of Italian drawings informed petitioner that the National Gallery was interested in purchasing that drawing.  Petitioner advised her that Christie's could sell the drawing in question at auction for $100,000 and that he would be willing to sell it to the National Gallery for an amount exceeding $100,000.  Thereafter, petitioner received a letter from the National Gallery offering to purchase the drawing in question for $115,000.  In January 1989, petitioner sold it to that museum for that amount.

During all relevant periods, petitioner did not own or acquire any drawings, other than the drawing in question, that were either unattributed or misattributed and for which proper attribution was obtained.  During the 1970's, petitioner did not attempt to sell any of the drawings that he had acquired during those years.  During the period 1985 through 1994, petitioner did not sell any artwork or collectible, other than the drawing in question.  After the sale of the drawing in question, petitioner did not use the proceeds from its sale to purchase other drawings for purposes of attribution and sale.

Petitioner's Simplified Employee Pension

During 1989, petitioner informed his tax preparer, Thomas A.

---

[5]  At some time prior to 1982, petitioner attempted to sell the drawing in question through Christie's.  However, upon being advised by Christie's that that drawing had a value of $500, petitioner decided not to auction it at that time.

McVeigh, Jr. (Mr. McVeigh), about the sale of the drawing in question and inquired about establishing some type of retirement plan. Mr. McVeigh advised petitioner to consult with Earl Schoenborn about establishing a retirement plan. The three of them met and discussed the amount of the contribution that petitioner could make to a retirement plan for 1989 after taking into account the approximate amount of petitioner's income and expenses during 1989 from various sources, including the New Life Center and the sale of the drawing in question.

Sometime thereafter, petitioner chose to consult with another individual about establishing a retirement plan. Petitioner established a simplified employee pension (SEP) for 1989 to which he contributed $20,000. Petitioner's contributions to the SEP for 1990 and 1991 were $30,000 and $26,000, respectively.

Petitioner's Horse Activity and Cattle Activity

### Petitioner's Horse Activity

During the early 1970's, petitioner, who has at all relevant times enjoyed equestrian activities, owned a horse, took riding lessons, and learned how to train a horse (1) to perform at an unspecified level in dressage and (2) to do low-level jumps, provided that the horse had received some training in jumping.

In July 1988, petitioner, who did not have any formal training as a horse breeder or a horse trainer, purchased for approximately $8,000 a five-year old thoroughbred gelding named Moonshadow (Moonshadow) that had received some training in riding

and jumping as a result of having been used in fox hunting and that had been exhibited in certain horse shows. When he acquired Moonshadow, petitioner believed that it was a willing jumper. He planned to train Moonshadow in dressage, jumping, and/or cross-country riding, although he was aware that such activities would expose that (as well as any other) horse to a significant risk of injury. Although petitioner expected to spend around two years in training a horse such as Moonshadow, he was aware that the training period could vary depending, inter alia, on the level of training that it had received prior to the time he purchased it and the type of training that he chose to provide to it. Petitioner hoped to be able to sell Moonshadow after it was trained.

During the period 1988 through sometime in 1990, petitioner spent about two-and-a-half to three hours a day, or about 15 to 18 hours a week in riding, exercising, and caring for Moonshadow. Petitioner spent that time during the mornings when he was not providing services as a psychologist.

At no time did petitioner investigate or project the price at which he would have to sell Moonshadow in order to realize a profit from such a sale. Nor did he contemplate or inquire about the risks associated with owning a gelding such as Moonshadow if it were to become lame (i.e., not only could it not continue its training in, or be used for, any of the activities that petitioner had in mind when he acquired Moonshadow, it also could not be used for breeding). In fact, petitioner did not become aware

of those risks until Moonshadow became lame sometime during 1990, approximately 18 months after petitioner had acquired it.

Petitioner had physical examinations, x-rays, and blood work performed on Moonshadow. However, the cause of Moonshadow's lameness was not determined. Although petitioner provided Moonshadow with bed rest and took certain measures to alleviate the horse's pain, he was unable to rehabilitate it. Around 1995, petitioner donated Moonshadow to the Virginia Polytechnic Institute (VPI).

Although petitioner became aware of the risks associated with owning a gelding after his experience with Moonshadow during 1990, he nonetheless decided to purchase another gelding because geldings were considered to be the most valuable show horses. Consequently, sometime during 1990, after Moonshadow became lame, petitioner purchased for approximately $8,000 another gelding, a five-year old named Gator (Gator) that already had had some minimal training. Sometime during or after the spring of 1994, petitioner retained the services of a horse trainer who worked with Gator on suppling exercises on the flat, lead changes, and consistency in the show ring. At unspecified times after the purchase of Gator, petitioner entered it in certain horse shows not for the nominal prize money, but for the recognition that it might gain that would make it attractive to potential buyers. Gator, however, exhibited certain difficulties that will prevent it from ever becoming a show horse of great value.

After his experience with Moonshadow during 1990, petitioner concluded that if he were to purchase either a mare or a stallion and that horse were to become lame or otherwise to lack athletic ability, it could still be used for breeding purposes. Sometime during 1990, after Moonshadow became lame, petitioner purchased for approximately $3,500 to $4,000 a proven broodmare, a four-year old thoroughbred named Jill (Jill) that had had no training except for training in accepting a rider. Thereafter, around 1990, petitioner rode Jill, concluded that it did not possess the characteristics necessary for a show horse or a competitive horse, which he did not realize when he purchased Jill, and decided to use it only for breeding purposes.[6]

Around 1990, petitioner bred Jill to an internationally acclaimed dressage Trakehner stallion, even though he knew that a crossbreeding of a thoroughbred and a Trakehner would probably require that any male offspring be gelded. During 1991, the crossbreeding of Jill produced a colt named Zack (Zack) that was gelded within nine months thereafter.

Around 1992, when Zack was a year old, it was trained to accept a lightweight rider. Around 1995, when Zack was a three-year old, it was trained to accept a rider of normal weight and

---

[6] Any horse that petitioner acquired through the breeding of a mare such as Jill (1) would not be ready for serious training until the age of two at which time it could support a rider; (2) could not perform and compete as a show horse until the age of three; and (3) could not become a show horse of great value until at least the age of six.

was trained to jump by a professional trainer that petitioner hired. Sometime thereafter, Zack developed pedalostitis, a foot disease that prevented it from performing athletic activities. Around 1995, petitioner donated Zack to VPI.

During 1992, petitioner met Sue Attisani Lyman (Ms. Lyman), a horse trainer and breeder since 1979, and bred Jill to Ms. Lyman's stallion for a stud fee of approximately $1,000. That breeding produced a filly named Lily (Lily) around 1993. During 1995, when petitioner started to provide Lily with some undisclosed type of training, he discovered that it had fractured its shoulder and hip and could not be trained as an athlete at that time, and he therefore abandoned any attempt to train Lily at that time. As of the time of the trial herein, petitioner planned to breed Lily in the spring of 1996 and to sell it as a broodmare.

Around 1993, petitioner again bred Jill to Ms. Lyman's stallion for a stud fee of between $1,000 and $1,900. That breeding produced a filly named Bunny (Bunny) during 1994. Petitioner entered Bunny (1) in a horse show as a six-week old with its dam Jill where it performed favorably; (2) in a horse show as a yearling where it was the winner in a particular class; and (3) in an international horse show for young prospective show horses where it was the champion for yearling fillies. At some undisclosed time during 1995, petitioner entered into a contract to sell Bunny for $8,500 that was conditioned on the purchaser's

ability to raise the necessary funds. Because of the purchaser's inability to do so, the sale was not consummated. Although during the fall of 1995 petitioner saddled Bunny and allowed it to be ridden, he did not intend to provide other training for it until it was three years old.

In December 1994, petitioner purchased another broodmare that had a filly in the spring of 1995.

In the spring of 1995, petitioner and Ms. Lyman jointly (1) purchased a three-year old untrained gelding named Ziggy (Ziggy) for $10,000, a price that was substantially below its fair market value; (2) sold it about a month later for $30,000; and (3) split a substantial profit after accounting for their minimal expenses (e.g., boarding, training, and veterinarian fees) of between $500 and $1,000.

Prior to 1993 or 1994, petitioner boarded his horses at facilities owned by others and incurred total average expenses for each such horse of about $500 a month. Around 1993 or 1994, petitioner began boarding the horses that he then owned in the barn and paddocks located on real property (NLC land) that he had acquired near Middleburg, Virginia, and that the New Life Center was using as a residential facility for patients.

At some unspecified time during the period 1992 through 1995, petitioner asked Ms. Lyman to give him riding lessons and to advise him on how to market his young horses. Starting in the spring of 1994, petitioner asked Ms. Lyman from time to time to

train some of his horses, including Gator.

At no time did petitioner retain the services of anyone to appraise the fair market value of his horses. Petitioner did not project during the years at issue, or at any other time, the future income, expenses, or profits that he expected would be generated by his horse activity.

### Petitioner's Cattle Activity

Sometime during 1990, petitioner, who did not have any formal training as a cattle breeder, purchased for $3,000 a herd of cattle consisting of a bull and four cows (cows) with calf. During 1990 or 1991, and each year thereafter, the cows produced calves. Petitioner kept the bull, cows, and calves (cattle) on the NLC land. During the winter months, the cattle consumed approximately five bales of hay that cost about $35 to $50 a bale, and, during the remainder of the year, they consumed the grass on the NLC land.

Petitioner kept the calves produced by his cows for six to seven months until they weighed around 250 pounds, at which time he sold them for approximately $250 each.

Petitioner did not project during 1990, or at any other time, the future income, expenses, or profits that he expected would be generated by his cattle activity.

Petitioner's Books and Records
Relating to His Horse Activity
and His Cattle Activity

During the years at issue, petitioner did not maintain a separate bank account for either his horse activity or his cattle activity. During those years, petitioner retained invoices, receipts, and canceled checks relating to the expenses that were incurred in those activities.[7] However, he did not maintain books or records such as ledgers and registers to memorialize the various transactions relating to those activities or to maintain a historical record of those activities (e.g., the dates on which horses were purchased, foals and calves were born, and calves were sold; the specific nature of any training that the horses that he owned received; and the specific periods during which any such training was provided).

Petitioner's Tax Returns

For the years 1988 through 1991, petitioner, who has a limited knowledge of the Federal income tax laws and who has not had any formal training in accounting or tax matters, retained the services of Mr. McVeigh, a tax return preparer since about 1982, to prepare his individual Federal income tax returns (returns).

Petitioner relied on Mr. McVeigh to prepare requests to extend the time within which to file his returns for 1989 and

---

[7] Those invoices, receipts, and canceled checks are not part of the record in this case.

1990. Mr. McVeigh completed and filed on petitioner's behalf Forms 4868 (Application for Automatic Extension of Time to File U.S. Individual Income Tax Return (application for automatic extension)) for those years that were dated April 11, 1990, and April 5, 1991, respectively, signed by petitioner, and requested a four-month extension of time until August 15, 1990, and August 15, 1991, respectively, within which to file his returns for those years. Line 1 of each of those applications required petitioner to make a reasonable estimate, based on the information available, of his tax liability for the year for which he was seeking an extension. In arriving at the respective estimated tax liabilities for 1989 and 1990 that Mr. McVeigh showed on line 1 of petitioner's applications for automatic extension for those years, Mr. McVeigh believed it reasonable, and so advised petitioner, that, given petitioner's situation, those estimates be based on the tax liability shown in petitioner's return for the year immediately preceding the year for which each such application was being filed, provided that petitioner paid each of those estimated tax liabilities by the time he filed each such application. Since the tax liabilities shown in petitioner's 1988 and 1989 returns were $9,041 and $9,043, respectively, Mr. McVeigh entered on line 1 of petitioner's applications for automatic extension for 1989 and 1990 estimated tax liabilities of $9,100 and $9,043, respectively. Those respective applications also indicated that for 1989 estimated tax payments

of $9,100 were made by petitioner and that for 1990 $4,908 of tax was withheld from petitioner and $4,135 of tax was paid with his 1990 application for automatic extension.

Petitioner filed returns for 1989 and 1990 that were dated August 14, 1990, and October 25, 1991, respectively, were received by the Internal Revenue Service (Service) on August 23, 1990, and November 1, 1991, respectively, and showed total tax liabilities of $9,043 and $15,716, respectively.[8]

Petitioner took account of the following items to arrive at the adjusted gross income of $61,892, $95,024, and $152,576 shown in his respective returns for 1989, 1990, and 1991:

|  | 1989 | 1990 | 1991 |
|---|---|---|---|
| Wages, salaries, etc. | $14,923 | $49,000 | $86,500 |
| Taxable interest | 1,956 | 982 | 441 |
| Dividends | 55 | 947 | 1,720 |
| Tax refunds | -- | 1,315 | -- |
| Schedules C | | | |
|   Net profit from | | | |
|     art sales | 99,000[9] | -- | -- |
|   Loss from commodities | | | |
|     and other investments | 2,925 | -- | -- |
|  | **1989** | **1990** | **1991** |
|   Loss for 1989 and net | | | |
|     profit for 1990 from | | | |
|     the New Life Center | 44,375 | 32,718 | -- |

---

[8]  All dollar amounts are rounded to the nearest dollar.

[9]  In Schedule C of his 1989 return relating to art sales, petitioner reported $100,000 as "Gross receipts or sales", $1,000 as "Cost of goods sold and/or operations", and $99,000 as "Net profit" with respect to the sale of the drawing in question. Petitioner concedes that he sold that drawing for $115,000, purchased it for $1,300, and realized a gain of $113,700 from its sale.

| | | | |
|---|---|---|---|
| Net profit from Psychological Testing Services | 7,372 | 34,930 | 104,371 |
| Schedule D capital gain | 18,339 | -- | 1,373 |
| Schedule E loss for 1989 and income for 1991 | 2,200 | -- | 4,317 |
| Schedule F loss | 10,253 | 7,780 | 19,588 |
| Deduction for one-half of self-employment tax | -- | 176 | 558 |
| Deduction for SEP contribution | 20,000 | 16,912 | 26,000[10] |

With respect to the $99,000 net profit that petitioner reported in Schedule C of his 1989 return relating to art sales, petitioner informed Mr. McVeigh that he sold the drawing in question during 1989 at a gain. Mr. McVeigh advised petitioner that an important factor in characterizing that gain as self-employment income was whether petitioner continued to purchase and sell drawings in the future. Petitioner informed Mr. McVeigh that he intended to do so. Based on the information that petitioner provided to Mr. McVeigh, Mr. McVeigh concluded that the gain from the sale of the drawing in question constituted self-employment income, and not long-term capital gain, and that it should be reported in a Schedule C of petitioner's 1989 return relating to art sales.

With respect to the automobile expense deductions claimed in Schedules C of petitioner's returns for the years at issue relating to Psychological Testing Services, petitioner gave Mr.

---

[10] Although petitioner's 1991 return erroneously showed that deduction as a deduction for "self-employed health insurance", the parties agree that that deduction was for petitioner's 1991 SEP contribution.

McVeigh information about the expenses relating to the business use of his automobile (e.g., the type of vehicle that he used for business purposes, the percentage of business use of that vehicle, and the miles traveled with that vehicle for business purposes). Mr. McVeigh advised petitioner that he could claim as an expense for the business use of his automobile either (1) a standard mileage deduction or (2) a deduction for depreciation and certain actual expenses (e.g., gasoline). However, in preparing Schedules C of petitioner's returns for the years at issue relating to Psychological Testing Services, Mr. McVeigh erroneously claimed both a standard mileage deduction and a deduction for depreciation and certain actual automobile expenses, as follows:

| Year | Depreciation Expense | Standard Mileage[11] | Other Expenses[12] |
|------|------|------|------|
| 1989 | $2,167 | $956 | -- |
| 1990 | 2,600 | 875 | $1,530 |
| 1991 | 2,550 | 1,856 | 634 |

Respondent determined in the notice of deficiency (notice), and petitioner concedes, that petitioner is not entitled to reduce his income from Psychological Testing Services for the

---

[11] The standard mileage deductions claimed in Schedules C of petitioner's returns for 1989, 1990, and 1991 relating to Psychological Testing Services were shown as deductions for "Car and truck expenses".

[12] The deductions for certain other automobile expenses that were claimed in Schedules C of petitioner's returns for 1990 and 1991 relating to Psychological Testing Services were shown as deductions for insurance and interest expenses.

years at issue by the following automobile expenses (disallowed automobile expenses) claimed in Schedules C of his returns for those years: (1) All claimed depreciation expenses for those years and (2) other expenses of $293 claimed for 1990. Petitioner was not aware of the errors relating to the disallowed automobile expenses that appeared in his returns for the years at issue and could not have detected them by reviewing those returns.

Based on what petitioner told Mr. McVeigh about his horse activity and his cattle activity, including that he intended to buy, train, and sell horses and that he had incurred certain expenses for various stables and training centers that Mr. McVeigh believed to be reputable, Mr. McVeigh concurred in petitioner's conclusion, and he and petitioner jointly decided, that the gross income, expenses, and loss from petitioner's horse activity during 1989 and the aggregate income, expenses, and losses from his horse activity and cattle activity during 1990 and 1991 should be reported in Schedules F of petitioner's returns for those years and that any loss from those activities could be used to reduce petitioner's income from other sources that was reported in those returns.

Schedule F of petitioner's return for each of the years 1988 and 1989, during which petitioner was engaged only in his horse activity, and not his cattle activity, reflected the following

income, expenses, and loss from that horse activity:

| Year | Income | Expenses | Loss |
|------|--------|----------|------|
| 1988 | -- | $3,648 | $3,648 |
| 1989 | -- | 10,253 | 10,253 |

Schedule F of petitioner's return for each of the years 1990 through 1994, during which he was involved in both his horse activity and his cattle activity, did not show separately the income and expenses attributable to each such activity. Instead, those schedules reflected the following aggregate income, expenses, and losses from both of those activities:

| Year | Aggregate Income | Aggregate Expenses | Aggregate Losses |
|------|------------------|--------------------|------------------|
| 1990 | -- | $7,780 | $7,780 |
| 1991 | $1,024 | 20,612 | 19,588 |
| 1992 | 1,017 | 29,708 | 28,691 |
| 1993 | 61,275[13] | 72,328[14] | 11,053 |
| 1994 | 1,083 | 38,561 | 37,478 |

All of the income that petitioner reported in Schedules F of his 1991, 1992, and 1994 returns and $1,275 of the income that he reported in Schedule F of his 1993 return were attributable to his cattle activity and represented income that he received during each of those years from the sale of calves. During 1991, petitioner incurred expenses of $1,024 in connection with his

---

[13] The aggregate income reported in Schedule F of petitioner's 1993 return included an unexplained income item of $60,000 that petitioner reported as "Other income".

[14] The aggregate expenses reported in Schedule F of petitioner's 1993 return included an unexplained interest expense of $29,202.

cattle activity.[15]

With respect to the $20,000 contribution that petitioner made to the SEP for 1989, petitioner informed Mr. McVeigh in April 1990 that he had established a retirement plan to which he timely contributed $20,000 and related the conversations that he had had with the individual who had assisted him in establishing that plan. Mr. McVeigh advised petitioner that the deductible amount of that contribution was limited to a percentage not to exceed 25 percent of petitioner's self-employment income and that that percentage varied depending on the nature of the retirement plan. Based on the information that petitioner gave Mr. McVeigh about, inter alia, the retirement plan that he had established and the sale of the drawing in question, Mr. McVeigh advised petitioner that he was entitled to deduct for 1989 his $20,000 contribution to that plan to the extent of 25 percent of his self-employment income for that year.[16] Mr. McVeigh further advised petitioner that, in calculating his self-employment income for 1989 for purposes of determining the deductible portion of his $20,000 retirement plan contribution, he should take into account only the Schedules C of his 1989 return that

---

[15] The record does not disclose the expenses that petitioner incurred during the years 1990, 1992, 1993, and 1994 in connection with his cattle activity.

[16] At trial, the parties agreed that any deduction to which petitioner may be entitled for each of the years 1989, 1990, and 1991 for contributions that he made to the SEP for each of those years is limited by sec. 404(h)(1)(C) to 15 percent, and not 25 percent, of his self-employment income for each such year.

showed net profits (viz., $99,000 net profit from art sales and $7,372 net profit from Psychological Testing Services), and not the Schedules C that showed losses (viz., $2,925 loss from commodities and other investments and $44,375 loss from New Life Center). Consequently, petitioner deducted in his 1989 return the entire $20,000 that he contributed to the SEP. That deduction exceeded (by $5,075) 25 percent of the aggregate amount (viz., $59,702) of the results shown in the various Schedules C of that return that petitioner reported as his "Business income" (business income) on page 1, line 12 of that return.

With respect to the $30,000 contribution that petitioner made to the SEP for 1990, petitioner deducted $16,912 in his return for that year. That deduction equaled 25 percent of the aggregate amount (viz., $67,648) of the results shown in the various Schedules C of that return that petitioner reported as his business income for 1990. With respect to the $26,000 contribution that petitioner made to the SEP for 1991, petitioner deducted that entire amount in his return for that year. That deduction equaled 24.91 percent of the amount (viz., $104,371) shown in Schedule C of that return that petitioner reported as his business income for 1991.

At the time that Mr. McVeigh prepared petitioner's returns for the years at issue, Mr. McVeigh did not know of any adverse tax consequences that might result if petitioner's retirement plan contribution for each such year exceeded the amount allow-

able as a deduction (excess contribution). Mr. McVeigh advised petitioner that he could make excess contributions, with the only consequence being that he could not deduct them.

After Mr. McVeigh prepared petitioner's return for each of the years at issue, he provided petitioner with a copy of each such return and pointed out to him the amount of tax that each such return showed as due. Petitioner did not review any of those returns and was merely interested in knowing the amount of tax due so that he could write a check for that amount.

OPINION

Petitioner bears the burden of proving that respondent's determinations in the notice are erroneous. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).

Petitioner attempted to satisfy his burden of proof in this case through his own testimony and that of Mr. McVeigh and Ms. Lyman. We found the testimony of Mr. McVeigh and Ms. Lyman to be credible. We found petitioner's testimony to be general, vague, conclusory, and/or questionable in certain material respects. Under the circumstances presented here, we are not required to, and we generally do not, rely on petitioner's testimony to sustain his burden of establishing error in respondent's determinations. See <u>Lerch v. Commissioner</u>, 877 F.2d 624, 631-632 (7th Cir. 1989), affg. T.C. Memo. 1987-295; <u>Geiger v. Commissioner</u>, 440 F.2d 688, 689-690 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159; <u>Tokarski v. Commissioner</u>, 87 T.C. 74, 77 (1986).

Gain from the Sale of
the Drawing in Question

The parties agree that petitioner purchased the drawing in question during the 1970's for $1,300, sold it during 1989 for $115,000, and realized a gain of $113,700 from that sale. The dispute here is whether that gain should be characterized as ordinary income, as petitioner contends, or as long-term capital gain, as respondent contends. The parties agree that if the Court were to determine that that gain is long-term capital gain, petitioner would not be entitled to deduct any amount for his contribution to the SEP for 1989 and that he would be liable for the excise tax imposed by section 4972(a) as determined by respondent.[17] The parties further agree that the resolution of the dispute over the character of the gain from the sale of the drawing in question depends on whether that drawing is "property held by * * * [petitioner] primarily for sale to customers in the ordinary course of his trade or business" within the meaning of section 1221(1). If it is, the gain at issue is ordinary income, and not capital gain.

The purpose of section 1221(1) is to "differentiate between the 'profits and losses arising from the everyday operation of a business' * * * and 'the realization of appreciation in value

---

[17] Petitioner does not dispute that if the Court were to determine that that gain is ordinary income, he would nonetheless be liable for the excise tax imposed by sec. 4972(a), but in a lesser amount than that determined by respondent. See supra note 16.

accrued over a substantial period of time'". Malat v. Riddell, 383 U.S. 569, 572 (1966) (quoting Corn Prods. Refining Co. v. Commissioner, 350 U.S. 46, 52 (1955), and Commissioner v. Gillette Motor Transp., Inc., 364 U.S. 130, 134 (1960)).

As used in section 1221(1), the word "primarily" means "of first importance" or "principally." Malat v. Riddell, supra at 572. The question whether property is property described in section 1221(1) is a factual inquiry. Pasqualini v. Commissioner, 103 T.C. 1, 6 (1994). In resolving that question, the courts have examined various factors, including the following: (1) The purpose for which the property was acquired; (2) the purpose for which it was held; (3) the frequency, continuity, and substantiality of sales; (4) the duration of ownership; (5) the use of the proceeds from the sale of the property; (6) the business of the taxpayer; and (7) the time and effort that the taxpayer devoted to sales activities relating to the asset in question by developing or improving that asset, soliciting customers, or advertising. See Graves v. Commissioner, 867 F.2d 199, 202 (4th Cir. 1989), affg. an Oral Opinion of this Court; United States v. Winthrop, 417 F.2d 905, 910 (5th Cir. 1969); Huey v. United States, 205 Ct. Cl. 551, 504 F.2d 1388, 1392 (1974); Maddux Constr. Co. v. Commissioner, 54 T.C. 1278, 1284 (1970); Hoover v. Commissioner, 32 T.C. 618, 627 (1959). No single factor, or combination thereof, is necessarily controlling. Graves v. Commissioner, supra at 202. The foregoing

factors have varying degrees of relevancy depending on the facts of a particular case, and all factors may not be relevant in a particular case. S & H, Inc. v. Commissioner, 78 T.C. 234, 243-244 (1982). Objective factors carry more weight than the taxpayer's subjective statement of his or her intent. Guardian Indus. Corp. v. Commissioner, 97 T.C. 308, 316 (1991), affd. without published opinion 21 F.3d 427 (6th Cir. 1994).

Based on our review of the entire record before us, and in particular the following facts, we find that petitioner has failed to establish that he held the drawing in question primarily for sale to customers in the ordinary course of his trade or business within the meaning of section 1221(1): (1) When petitioner acquired the drawing in question during the early 1970's, he did not intend to sell it; (2) petitioner conducted research throughout the 1970's and into the 1980's on the drawings that he had acquired during the 1970's; (3) during the 1970's, petitioner did not attempt to sell any of the drawings that he had acquired during those years; (4) petitioner did not sell any artwork or collectible, other than the drawing in question, during the period 1985 through 1994;[18] (5) petitioner purchased the drawing

---

[18] Petitioner relies on Stockton Harbor Indus. Co. v. Commissioner, 216 F.2d 638 (9th Cir. 1954), to support his contention that, notwithstanding the absence of any sales of drawings by petitioner other than the drawing in question, he held the drawing in question primarily for sale to customers in the ordinary course of his trade or business. We find that case to be distinguishable and petitioner's reliance on it to be misplaced. In the Stockton Harbor Indus. Co. case, the Court of
(continued...)

in question during the early 1970's and had it attributed to the correct artist around the early 1980's, but did not sell it until January 1989; (6) petitioner did not use the proceeds from the sale of the drawing in question to purchase other drawings for purposes of attribution and sale; and (7) petitioner engaged in a psychology practice during all relevant periods, the income from which provided his support during those periods.

To support his position under section 1221(1), petitioner contends that (1) during the 1970's, his research on the drawings that he had acquired and his attempts to attribute them to the correct artists were sporadic; (2) during 1979 or 1980, he changed his intention with respect to certain drawings that he had acquired during the 1970's, including the drawing in question, and decided to have those drawings attributed to the correct artists and sold at a profit; (3) during the 1980's, his research on those drawings and his attempts to enlist the interest of curators for purposes of attributing those drawings to the correct artists became systematic; (4) during 1989, after the

---

[18](...continued)
Appeals for the Ninth Circuit found that the taxpayer held certain condemned real estate primarily for sale to customers in the ordinary course of its trade or business. Id. at 651-656. In contrast to the instant case, the record in the Stockton Harbor Indus. Co. case established, inter alia, that (1) the taxpayer was a corporation organized for the purpose of dealing in real estate; (2) it acquired the real estate in question for the purpose of developing it as an industrial site; (3) it advertised and attempted to sell that real estate; and (4) it sold various parcels of that real estate prior to its condemnation. Id. at 652-655.

sale of the drawing in question, he abandoned his art activities because (a) there was a serious crash in the art market as a result of an economic recession during that year and (b) he was having difficulty in enlisting the interest of curators for purposes of attributing certain of his drawings to the correct artists.[19]  At trial, petitioner presented only his own testimony to support the foregoing allegations.  We are unwilling to rely on that testimony to establish those contentions.[20]  For example, it strains credulity that, as soon as petitioner sold in January 1989 the drawing in question, which was the only drawing, art-work, or collectible that the record shows he ever sold, the art market coincidentally and suddenly crashed, thereby materially

---

[19]  Petitioner further contends that his position that the drawing in question is property described in sec. 1221(1) is supported by the following facts:  Certain experts checked the physical stability of the drawing in question; it was determined that Anselmi had not sketched that drawing; the curator of Italian drawings attributed that drawing to Parmagianino; and the drawing in question received international exposure through art exhibits, newspapers, and art catalogues.  We are not persuaded by the foregoing facts on which petitioner relies and the other facts that we have found relating to the sale of the drawing in question that that drawing is property described in sec. 1221(1), and not a capital asset.

[20]  We note that even if we had found certain of those contentions as facts, they would not necessarily persuade us that the drawing in question was property described in sec. 1221(1).  For example, assuming arguendo that, during 1979 or 1980, petitioner had changed his intention with respect to certain drawings that he had acquired during the 1970's, including the drawing in question, and decided to have those drawings attributed to the correct artists and sold at a profit, that would not necessarily indicate that he held those drawings primarily for sale to customers in the ordinary course of his trade or business, and not for investment.  See Howell v. Commissioner, 57 T.C. 546, 555 (1972).

contributing to petitioner's decision to abandon his alleged business activities involving the sale of artwork.

On the instant record, we sustain respondent's determination that the gain that petitioner realized from the sale of the drawing in question is long-term capital gain.

Petitioner's Horse Activity and Cattle Activity

### Section 183--In General

Section 183(a) generally limits the amount of expenses that a taxpayer may deduct with respect to an activity "not engaged in for profit" to the deductions provided in section 183(b). Section 183(b)(1) provides that deductions that would be allowable without regard to whether such activity is engaged in for profit are to be allowed. Section 183(b)(2) further provides that deductions which would be allowable only if such activity is engaged in for profit are to be allowed, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable under section 183(b)(1). An activity is "not engaged in for profit" if it is an activity other than one with respect to which deductions are allowable for the taxable year under section 162 or section 212(1) or (2). Sec. 183(c).

In determining whether an activity is engaged in for profit, the taxpayer must show that he or she engaged in the activity with an actual and honest objective of making a profit. E.g., Hulter v. Commissioner, 91 T.C. 371, 392 (1988); Dreicer v.

Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983).  Although the taxpayer's expectation of a profit need not be reasonable, he or she must have a good faith objective of making a profit.  E.g., Dreicer v. Commissioner, supra at 645; Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. on another issue 615 F.2d 578 (2d Cir. 1980); sec. 1.183-2(a), Income Tax Regs.  Petitioners bear the burden of proving the requisite intent.  E.g., Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Johnson v. Commissioner, 59 T.C. 791, 813 (1973), affd. 495 F.2d 1079 (6th Cir. 1974).  Whether a taxpayer is engaged in an activity with the requisite profit objective is determined from all the facts and circumstances.  E.g., Hulter v. Commissioner, supra at 393; Taube v. Commissioner, 88 T.C. 464, 480 (1987); Golanty v. Commissioner, supra at 426; sec. 1.183-2(a) and (b), Income Tax Regs.  More weight is given to objective facts than to the taxpayer's mere statement of his or her intent.  E.g., Dreicer v. Commissioner, supra at 645; sec. 1.183-2(a), Income Tax Regs.

The regulations promulgated under section 183 list the following nine factors that should normally be taken into account in determining whether an activity is engaged in for profit: (1) The manner in which the taxpayer carried on the activity, (2) the expertise of the taxpayer or his advisers, (3) the time and effort expended by the taxpayer in carrying on the activity,

(4) the expectation that assets used in the activity may appreciate in value, (5) the success of the taxpayer in carrying on other similar or dissimilar activities, (6) the taxpayer's history of income or loss with respect to the activity, (7) the amount of occasional profits, if any, which are earned, (8) the financial status of the taxpayer, and (9) the extent to which elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs. The list of factors in the regulations is not exclusive, and other factors may be considered in determining whether an activity is engaged in for profit. No single factor is dispositive. E.g., Golanty v. Commissioner, supra at 426; sec. 1.183-2(b), Income Tax Regs. The determination of a profit objective does not depend on counting the number of factors that support each party's position. E.g., Dunn v. Commissioner, supra at 720; sec. 1.183-2(b), Income Tax Regs.

Petitioner contends that (1) during 1989, 1990, and 1991, he was engaged in his horse activity for profit within the meaning of section 183; (2) during 1990 and 1991, he was engaged in his cattle activity for profit within the meaning of section 183; and (3) during 1990 and 1991, his horse activity and his cattle activity constituted one activity for purposes of that section. Respondent disagrees with each of petitioner's contentions.

We turn first to whether, during 1990 and 1991, petitioner's horse activity and cattle activity constituted one activity or two separate activities for purposes of section 183. Section

1.183-1(d), Income Tax Regs., provides that, in determining whether several undertakings of a taxpayer constitute one activity or two or more separate activities for purposes of section 183, we must consider all of the facts and circumstances, including: (1) The degree of organizational and economic interrelationship of the undertakings, (2) the business purpose, if any, that is served by carrying on the undertakings separately or together, and (3) the similarity of the two undertakings.

Petitioner argues that, during 1990 and 1991, his horse activity and his cattle activity constituted a single activity for purposes of section 183 because he planned to expand his herd of cattle and to use that cattle to help manage the pasture for his horses. On the record before us, we reject petitioner's argument. Except for petitioner's self-serving testimony on which we are unwilling to rely, there is no evidence in the record to support petitioner's assertion that, during 1990 or 1991, he planned to expand his herd of cattle and use them for pasture management or that he thereafter took any measures to implement that alleged plan. In fact, petitioner did not even keep the cattle and the horses on the same land during 1990 and 1991; they were not kept on the same land until sometime around 1993 or 1994.

On the record before us, we find that petitioner has failed to establish that, during 1990 and 1991, his horse activity and his cattle activity constituted one activity for purposes of

section 183.[21]  We shall therefore treat each such activity as a
separate activity for those purposes.

Petitioner's Horse Activity

At all relevant times, petitioner has enjoyed equestrian
activities.  During the early 1970's, he owned a horse, took
riding lessons, and learned how to train a horse (1) to perform
at an unspecified level in dressage and (2) to do low-level
jumps, provided that the horse had received some training in
jumping.  During 1988, petitioner, who did not have any formal
training as a horse trainer or horse breeder, acquired Moon-
shadow, a horse that had had some training in riding and jumping.
He planned to train Moonshadow in dressage, jumping, and/or
cross-country riding--activities that petitioner knew would
expose that (and any other) horse to a significant risk of
injury.  Petitioner hoped to be able to sell Moonshadow after it
was trained.  However, the record does not establish that during
the years at issue petitioner had or attempted to acquire the
expertise that he needed to carry out the training that he
testified he envisioned for Moonshadow (and the other horses that
he acquired) or that he consulted with others who had such

---

[21]  Even assuming arguendo that we had found that, during 1990
and 1991, petitioner's horse activity and his cattle activity
constituted one activity for purposes of sec. 183, on the record
before us, we would nonetheless find that petitioner has failed
to establish that he was engaged in that activity during those
years with the requisite profit motive within the meaning of sec.
183.

expertise.[22]

Petitioner spent time in riding, exercising, and/or caring for Moonshadow from July 1988 when he acquired it until sometime during 1990 when it became lame. During that period, petitioner spent about 15 to 18 hours a week in riding, exercising, and caring for Moonshadow during the mornings when he was not providing services as a psychologist.[23] Although the record establishes that during 1990 petitioner purchased Jill[24] and Gator[25] and rode Jill and that around 1991 Jill had a colt named Zack, it

---

[22] Petitioner claims that during the years at issue he hired experts to train his horses. However, the record does not identify such experts, their qualifications, or the specific training that they allegedly provided to petitioner's horses during those years. What the record does show is that it was not until 1994, after the years at issue, that petitioner asked Ms. Lyman from time to time to train some of his horses and that it was at some undisclosed time during the period 1992 through 1995 that petitioner asked her to advise him how to market them.

[23] Petitioner suggested in his testimony that, during the period from July 1988 until Moonshadow became lame in 1990, he worked with Moonshadow in the ring in an effort to teach it to move laterally and backwards. We found petitioner's testimony in this regard to be general and vague. For example, he did not specify the extent of, or the time he spent on, any such exercises for Moonshadow.

[24] When petitioner acquired Jill sometime during 1990 after Moonshadow became lame, he did not realize that it did not possess the characteristics necessary for a show horse or a competitive horse, from which we infer that he may not have properly investigated the potential of that horse before he purchased it.

[25] Petitioner purchased Gator, a five-year old gelding, during 1990. However, Ms. Lyman did not begin to train any of petitioner's horses until the spring of 1994. Although Ms. Lyman provided some training to Gator, it is not clear from the record whether that training occurred in the spring of 1994 or thereafter.

shows nothing else about what, if anything, petitioner did with or for (1) Jill and Gator during 1990 and (2) Moonshadow, Jill, Gator, and Zack during 1991.

Petitioner did not during the years at issue (or at any other time) project the future income, expenses, or profits that he expected would be generated by his horse activity. Nor did he contemplate or inquire about the risks associated with owning Moonshadow if it were to become lame (i.e., not only could it not continue its training in, or be used for, any of the activities that petitioner had in mind when he acquired Moonshadow, it also could not be used for breeding since it was a gelding).

During the years at issue, although petitioner retained invoices, receipts, and canceled checks relating to the expenses that were incurred in his horse activity, he did not maintain a separate bank account for that activity or books or records, such as ledgers and registers, to memorialize the various transactions relating thereto or to maintain a historical record of that activity (e.g., the dates on which horses were purchased and foals were born, the specific nature of any training that the horses that he owned received, and the specific periods during which any such training was provided). In short, petitioner failed to show that during the years at issue he maintained complete and accurate books and records that were consistent with a profit motive or that he carried on his horse activity in a businesslike manner.

In Schedules F of his returns for 1988 and 1989, petitioner reported no income and losses of $3,648 and $10,253, respectively, from his horse activity. In Schedules F of his returns for 1990 and 1991, petitioner reported aggregate income of $0 and $1,024, respectively, from both his horse and cattle activities and aggregate losses of $7,780 and $19,588, respectively, from both of those activities.[26] The aggregate losses that petitioner reported in Schedules F of his returns for 1992 and 1994 from those activities were $28,691 and $37,478, respectively. The aggregate loss from those activities that he reported in Schedule F of his 1993 return decreased from the prior year to $11,053, presumably because of an unexplained $60,000 income item and an unexplained $29,202 interest expense item for that year.

Petitioner had sufficient income during the years at issue from various sources so as to enable him to maintain a comfortable standard of living, notwithstanding the losses from his horse activity that he was able to use to reduce his tax liabil-

---

[26] Although petitioner did not show separately the respective income, expenses, and losses associated with his horse activity and his cattle activity for 1990 through 1994, the record herein otherwise establishes (1) that the income reflected in Schedules F of petitioner's returns for 1991 through 1994 was solely from his cattle activity except for an unexplained $60,000 income item for 1993 and (2) that petitioner had expenses relating to his cattle activity during 1991 in the amount of $1,024. Moreover, based on the characterization of certain expenses that petitioner claimed in Schedules F of his 1990, 1992, 1993, and 1994 returns, it appears that at least $1,428, $17,623, $18,561, and $17,845, respectively, of the aggregate expenses claimed therein related to his horse activity.

ity for those years.[27]

Petitioner claims that he expected the horses that he acquired to appreciate in value after he trained them. In support of that claim, petitioner points to the fact that during 1995 petitioner and Ms. Lyman sold Ziggy for $30,000 one month after they acquired it for $10,000. We do not take issue with the proposition that a particular horse, depending on its breed, training, and other facts and circumstances, may appreciate in value.[28] However, the record contains no reliable evidence of the appreciation, if any, in the value of the horses that petitioner acquired during the years at issue or thereafter. Petitioner did not at any time retain the services of anyone to appraise the fair market value of his horses. The only evidence in the record relating to the value of petitioner's horses is petitioner's own testimony as to the value of Zack and Bunny and Ms. Lyman's testimony as to the value of Gator and Bunny.[29] With

[27] In his returns for 1989, 1990, and 1991, petitioner reported taxable income, excluding the losses from his horse activity and his cattle activity, of $92,145, $119,892, and $198,722, respectively, and the parties agree that taxable income for those years, excluding such losses, should be increased by $49,376, $17,882, and $7,733, respectively.

[28] On the record before us, we find that Ziggy did not materially appreciate in value, if it appreciated at all, during the period in which petitioner and Ms. Lyman owned that horse until they sold it one month later. That is because, when they purchased Ziggy, they paid a price (i.e., $10,000) that was substantially below its fair market value.

[29] Ms. Lyman testified that, as of the time of the trial, Gator had a value of about $25,000 and Bunny was expected to have a

(continued...)

respect to petitioner's testimony, although, as the owner of the horses, he was qualified to testify as to their value, we are not required to, and we do not, accept his self-serving testimony on that point. See Harmon v. Commissioner, 13 T.C. 373, 383 (1949). With respect to Ms. Lyman's testimony about the value of petitioner's horses, Ms. Lyman was not qualified as an expert witness in this case and thus was not qualified to opine on the value of petitioner's horses.

Even assuming arguendo that petitioner did, in fact, expect the horses that he acquired to appreciate in value, he failed to establish that he intended in good faith that any expected appreciation in the value of those horses when realized, would together with any other income from his horse activity, exceed the expenses from that activity.

Petitioner further claims that the losses that he sustained during the years 1988 through 1994 are attributable to Moon-shadow's becoming lame during 1990 and Lily's sustaining injuries and Zack's developing a foot disease around 1995. Losses sustained because of unforeseen or fortuitous circumstances beyond the control of the taxpayer are generally not to be considered as

---

[29](...continued)
value of about $15,000 to $20,000 in the spring of 1996 and about $25,000 in 1997. Petitioner disagreed with Ms. Lyman's testimony about the value of Bunny in 1997 when he testified that, as of the time of the trial, he expected Bunny to have a value of between $30,000 and $50,000 in 1997. Petitioner also testified that, as of the trial, Zack, a young horse with minimal training, had a value of between $8,500 and $10,000.

a factor indicating that the activity was not engaged in for profit.  Faulconer v. Commissioner, 748 F.2d 890, 900-901 (4th Cir. 1984); sec. 1.183-2(b)(6), Income Tax Regs.

We note initially that, when petitioner decided to acquire Moonshadow in 1988, he was aware that the activities of dressage, jumping, and/or cross-country riding would expose that (and any other) horse to a significant risk of injury.  Thus, any losses sustained as a result of injuries to his horses should not have been unforeseen by petitioner.

As for petitioner's contention that Moonshadow's lameness during 1990 was responsible for the losses that he reported for the years at issue and thereafter, petitioner claims that he was about to offer Moonshadow for sale at the time it became lame and that it had a value of about $25,000 at that time.  The record does not contain any reliable evidence showing (1) the value of Moonshadow at the time it became lame, (2) the attempts, if any, that petitioner made, or planned to make, to sell Moonshadow, or (3) the profit that would have been generated from such a sale taking into account the price that petitioner paid for Moonshadow in 1988 and the expenses that he incurred from then until 1990 when Moonshadow became lame.[30]

With respect to petitioner's claims about the injuries to Lilly and Zack's foot disease that occurred around 1995, we fail

---

[30]  It is also noteworthy that although Moonshadow became lame in 1990, petitioner kept that horse and continued to incur expenses with respect to it until he donated it to VPI around 1995.

to see how those physical problems affected the profitability of petitioner's horse activity for any of the preceding years, including the years at issue.

We have considered and reject all of petitioner's other claims and contentions with respect to his horse activity.

Based on our review of the entire record before us, we find that petitioner has failed to establish that during the years at issue his horse activity was an activity engaged in for profit within the meaning of section 183. Accordingly, we sustain respondent's determinations that the deductions that petitioner claimed for 1989, 1990, and 1991 relating to his horse activity are limited by section 183(a) and (b).

Petitioner's Cattle Activity

During 1990, petitioner, who did not have any formal training as a cattle breeder, purchased for $3,000 a herd of cattle consisting of a bull and four cows with calf. The cows produced calves during 1990 or 1991 and each year thereafter. Petitioner kept his cattle on the NLC land. During the winter months, they consumed approximately five bales of hay that cost about $35 to $50 a bale, and, during the remainder of the year, they consumed the grass on the NLC land.

Petitioner kept the calves produced by his cows for six to seven months until they weighed around 250 pounds, at which time he sold them for approximately $250 each.

During 1991, petitioner received $1,024 from the sale of the

calves and incurred expenses in that same amount in connection with his cattle activity. During 1992, 1993, and 1994, petitioner received $1,017, $1,275, and $1,083, respectively, from the sale of the calves, but the record does not disclose the expenses that he incurred during those years in connection with his cattle activity.[31]

Petitioner did not project during 1990, or at any other time, the future income, expenses, or profits that he expected would be generated by his cattle activity. Although during 1990 and 1991 petitioner retained invoices, receipts, and canceled checks relating to the expenses incurred in his cattle activity, he did not maintain a separate bank account for that activity or books or records, such as ledgers and registers, to memorialize the various transactions relating thereto or to maintain a historical record of that activity (e.g., the dates on which calves were born and sold).

To support his contention that he was engaged in his cattle activity during 1990 and 1991 with a profit motive, petitioner relies on his receipt of income from the sale of calves during 1991 through 1994 in amounts ranging from $1,017 to $1,275.[32] Receipt of income is not necessarily indicative of a profit

---

[31] Petitioner testified that he incurred virtually no expenses in connection with his cattle activity, other than annual expenses of approximately $175 to $250 for winter feed for the cattle. We are unwilling to rely on that testimony. It is inconsistent with his oral stipulation at trial that during 1991 he incurred expenses relating to his cattle activity of $1,024.

[32] Petitioner concedes that he did not expect his cattle to appreciate in value.

motive.  In contrast, realizing a profit would be indicative of such a motive.  However, on the record before us, we find that petitioner did not realize a profit from his cattle activity for 1990 or 1991.  On that record, we are unable to determine whether he realized a profit from that activity for 1992, 1993, and 1994.

Based on our review of the entire record before us, we find that petitioner has failed to establish that during 1990 and 1991 his cattle activity was an activity engaged in for profit within the meaning of section 183.  Accordingly, we sustain respondent's determinations that the deductions that petitioner claimed for 1990 and 1991 relating to his cattle activity are limited by section 183(a) and (b).

Additions to Tax and Accuracy-Related Penalties

Section 6651(a)(1)

Respondent determined that petitioner is liable for each of the years 1989 and 1990 for the addition to tax under section 6651(a)(1) because he failed to file timely his return for each such year.  For purposes of section 6651(a)(1), the determination of the prescribed date for filing a return must be made by reference to any extension of the time for filing the return.  The addition to tax under section 6651(a)(1) does not apply if it is shown that the failure to file was due to reasonable cause, and not willful neglect.  In order to prove reasonable cause, the taxpayer must show that, despite the exercise of ordinary business care and prudence, he or she was nevertheless unable to file the return within the prescribed time.  United States v. Boyle,

469 U.S. 241, 246 (1985); sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

For 1989 and 1990, petitioner filed applications for automatic extension that were dated April 11, 1990, and April 5, 1991, respectively, and that requested a four-month extension of time until August 15, 1990, and August 15, 1991, respectively, within which to file his returns for those years. The parties agree that petitioner also filed a second request (application for additional extension of time) that was dated August 8, 1991, in order to extend the period within which to file his 1990 return to October 15, 1991.

Petitioner contends that the addition to tax under section 6651(a)(1) should not be imposed for either 1989 or 1990 because he relied on Mr. McVeigh to prepare the applications for automatic extension for those years. Respondent disagrees.

We have found as facts that petitioner relied on Mr. McVeigh to prepare requests to extend the time within which to file his returns for 1989 and 1990. Line 1 of each of those requests required petitioner to make a reasonable estimate, based on the information available, of his tax liability for the year for which he was seeking an extension. In arriving at the respective estimated tax liabilities for 1989 and 1990 that Mr. McVeigh showed on line 1 of petitioner's applications for automatic extension for those years, Mr. McVeigh believed it reasonable, and so advised petitioner, that, given petitioner's situation,

those estimates be based on the tax liability shown in petitioner's return for the year immediately preceding the year for which each such application was being filed, provided that petitioner paid each of those estimated tax liabilities by the time he filed each such application. Since the tax liabilities shown in petitioner's 1988 and 1989 returns were $9,041 and $9,043, respectively, Mr. McVeigh entered on line 1 of petitioner's applications for automatic extension for 1989 and 1990 estimated tax liabilities of $9,100 and $9,043, respectively. Those respective applications also indicated that for 1989 estimated tax payments of $9,100 were made by petitioner and that for 1990 $4,908 of tax was withheld from petitioner and $4,135 of tax was paid with his 1990 application for automatic extension.

When an accountant advises a taxpayer on a matter of tax law in circumstances such as these, it is reasonable for the taxpayer to rely on that advice. See United States v. Boyle, supra at 251. On the record before us, we find that petitioner's reliance on Mr. McVeigh's advice with respect to the preparation of his applications for automatic extension of time for 1989 and 1990 was reasonable and in good faith and constituted reasonable cause within the meaning of section 6651(a)(1). Accordingly, we reject respondent's determinations under section 6651(a)(1) for 1989 and, with one exception, for 1990. That exception for 1990 relates to the facts that petitioner's return for that year was dated October 25, 1991, and was received by the Service on

November 1, 1991.  Yet, the parties agree that the application for additional extension of time was filed in order to extend the time within which to file his 1990 return to October 15, 1991. On the record before us, we sustain respondent's determination under section 6651(a)(1) for 1990 only to the extent that petitioner filed his 1990 return after October 15, 1991.

### Section 6662(a)

Respondent determined that petitioner is liable for the years at issue for the accuracy-related penalty under section 6662(a) because a portion of the underpayment of tax for each of those years was due to negligence, disregard of rules and regulations, or a substantial understatement of income tax.

Section 6662(a) imposes an addition to tax equal to 20 percent of the underpayment of tax attributable to, inter alia, (1) negligence or disregard of rules or regulations and (2) any substantial understatement of income tax.  Sec. 6662(b)(1) and (2).  For purposes of section 6662(a), the term "negligence" includes any failure to make a reasonable attempt to comply with the Code, and "disregard" includes any careless, reckless, or intentional disregard.  Sec. 6662(c).  Negligence has also been defined as a lack of due care or failure to do what a reasonable person would do under the circumstances.  Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992), affg. T.C. Memo. 1991-179; Antonides v. Commissioner, 91 T.C. 686, 699 (1988), affd. 893 F.2d 656 (4th Cir. 1990).  With respect to individuals,

an understatement of tax is substantial if it exceeds the greater of 10 percent of the tax required to be shown in the return or $5,000. Sec. 6662(d)(1)(A). An understatement of tax is equal to the amount of tax required to be shown in the return less the amount shown therein. Sec. 6662(d)(2)(A).

The accuracy-related penalty under section 6662(a) does not apply to any portion of an underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith. Sec. 6664(c)(1). The determination of whether a taxpayer acted with reasonable cause and in good faith depends upon the pertinent facts and circumstances, including the taxpayer's efforts to assess his or her proper tax liability, the knowledge and experience of the taxpayer, and reliance on the advice of a professional, such as an accountant. Sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioner contends that he is not liable for any of the years at issue for the accuracy-related penalty under section 6662(a) because he relied on the advice of his accountant, Mr. McVeigh, for the preparation of his returns for those years.[33] Respondent disagrees.

A taxpayer generally cannot avoid the duty of filing an accurate return by placing that responsibility on an agent.

---

[33] Petitioner does not rely on sec. 6662(d)(2)(B) in order to reduce the underpayment for each of the years at issue that respondent determined is attributable to a substantial understatement of income tax.

Pritchett v. Commissioner, 63 T.C. 149, 174 (1974).  A taxpayer bears the responsibility for any negligent errors of his or her accountant.  American Properties, Inc. v. Commissioner, 28 T.C. 1100, 1116-1117 (1957), affd. per curiam 262 F.2d 150 (9th Cir. 1958). However, a taxpayer may avoid the accuracy-related penalty under section 6662(a) for negligence or substantial understatement by showing that his reliance on the advice of a professional, such as an accountant, was reasonable and in good faith.  Sec. 1.6664-4(b)(1), Income Tax Regs.  In the case of claimed reliance on the accountant who prepared the taxpayer's return, the taxpayer must establish that correct information was provided to the accountant and that the item incorrectly claimed or reported in the return was the result of the accountant's error.  See Ma-Tran Corp. v. Commissioner, 70 T.C. 158, 173 (1978).  A taxpayer's reliance on the advice of an accountant is not reasonable or in good faith where a cursory review of a taxpayer's return would reveal an omission from income.  Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662 (1987).

We note initially that with respect to the items that respondent contends were due to negligence, disregard of the rules or regulations, or a substantial understatement of income tax, the record contains evidence only as to the items specifically identified and discussed below.  The record does not contain any evidence as to the remainder of those items (remaining items) on all of which petitioner bears the burden of proof;

nor does it show what information petitioner may have provided to Mr. McVeigh, or what advice Mr. McVeigh may have given petitioner, regarding those remaining items. Accordingly, we find that petitioner has failed to establish that any reliance by him on Mr. McVeigh with respect to the remaining items was reasonable and in good faith. Consequently, we sustain respondent's determinations imposing on petitioner the accuracy-related penalty on the portion of the underpayment for each of the years at issue that is attributable to those items.

### Negligence or Disregard of the Rules or Regulations

#### Petitioner's Underreporting of the Gain from the Sale of the Drawing in Question

In Schedule C of his 1989 return relating to art sales, petitioner reported a gain of $99,000 from the sale of the drawing in question. The parties agree that petitioner realized a gain of $113,700 from the sale of that drawing. Although not determined in the notice, respondent contends on brief that petitioner's underreporting of the gain from the sale of the drawing in question was due to negligence or disregard of rules and regulations. This issue constitutes a new matter on which respondent bears the burden of proof. Rule 142(a); Foster v. Commissioner, 80 T.C. 34, 197 (1983), affd. in part and vacated in part 756 F.2d 1430 (9th Cir. 1985).

The record does not establish what petitioner told Mr. McVeigh about the sales price of the drawing in question, the

purchase price of that drawing, and the gain realized from its sale. However, assuming arguendo (1) that petitioner had told Mr. McVeigh that he sold the drawing in question for $115,000, that he had purchased it for $1,300, and that he realized a gain of $113,700 from its sale and (2) that Mr. McVeigh erroneously reported gross receipts of $100,000 from the sale of the drawing in question, a cost of goods sold of $1,000 for that drawing, and a gain of $99,000 from its sale, petitioner was nonetheless negligent in underreporting the gain from that sale in his 1989 return. Petitioner had an obligation to review that return before filing it. See Metra Chem Corp. v. Commissioner, supra at 662. Petitioner, however, did not review it; he was merely interested in knowing the amount of tax due so that he could write a check for that amount. If petitioner had reviewed Schedule C of his 1989 return relating to art sales, he would have known that the gain from the sale of the drawing in question was underreported. See id. at 662.

On the record before us, we find that any reliance by petitioner on Mr. McVeigh was not reasonable or in good faith insofar as it relates to the underreporting of the gain from the sale of the drawing in question (viz., $99,000, instead of $113,700). Consequently, we find that petitioner is liable for the accuracy-related penalty on the portion of the underpayment for 1989 that is attributable to that underreported gain.

Petitioner's Claimed Disallowed
Automobile Expenses

We have found that petitioner was not aware of the errors relating to the disallowed automobile expenses that Mr. McVeigh made in Schedules C of petitioner's 1989, 1990, and 1991 returns relating to Psychological Testing Services and that he could not have detected them by reviewing those returns.

On the record before us, we find that petitioner's reliance on Mr. McVeigh with respect to the claimed disallowed automobile expenses in petitioner's returns for the years at issue was reasonable and in good faith. Consequently, we reject respondent's determinations imposing the accuracy-related penalty on the portion of the underpayment for each such year that is attributable to those disallowed expenses.

### Substantial Understatement of Income Tax

#### Petitioner's Claimed Deductions of Losses From His Horse Activity and His Cattle Activity

We have found that, based on what petitioner told Mr. McVeigh about his horse activity and his cattle activity, including that he intended to buy, train, and sell horses[34] and that he had incurred certain expenses for various stables and training centers that Mr. McVeigh believed to be reputable, Mr. McVeigh concurred in petitioner's conclusion, and he and petitioner jointly decided, that the gross income, expenses, and loss from

---

[34] We note that this finding is based on Mr. McVeigh's testimony as to what petitioner told him about his intention with respect to his horse activity.

petitioner's horse activity during 1989 and the aggregate income, expenses, and losses from his horse activity and cattle activity during 1990 and 1991 should be reported in Schedules F of petitioner's returns for those years and that any loss from those activities could be used to reduce petitioner's income from other sources that was reported in each such return.  With respect to petitioner's horse activity, the record does not establish whether petitioner fully disclosed to Mr. McVeigh when he prepared petitioner's returns for the years at issue all the pertinent facts that would bear on the question whether petitioner carried on that activity with the requisite profit motive within the meaning of section 183 (e.g., facts relating to (1) the manner in which petitioner carried on those activities, (2) the extent of time or effort that he devoted to those activities, (3) whether he had the expertise necessary to train his horses, (4) whether he consulted with experts about training his horses, and (5) whether he expected his horses to appreciate in value). With respect to petitioner's cattle activity, the record does not establish whether petitioner informed Mr. McVeigh of any of the pertinent facts relating to that activity.

On the record before us, we find that petitioner has failed to establish that any reliance by him on Mr. McVeigh with respect to the claimed deductions in petitioner's returns for the years at issue of the losses from his horse activity and cattle activity was reasonable or in good faith.  Consequently, we sustain

respondent's determinations imposing the accuracy-related penalty on the portion of the underpayment for each such year that is attributable to such deductions.

### Petitioner's Claimed Deductions of SEP Contributions

For each of the years 1989 and 1991, petitioner underpaid his income tax as a result of the deductions that he claimed (viz., $20,000 and $7,977, respectively) and that respondent disallowed with respect to his SEP contribution for each such year.[35] For 1989, the underpayment of income tax attributable to petitioner's disallowed SEP deduction resulted from the following errors: (1) Including the gain from the sale of the drawing in question in Schedule C of petitioner's return and thus including that gain in petitioner's self-employment income;[36] (2) calculating petitioner's self-employment income by aggregating the results of only those Schedules C of petitioner's return that showed net profits, and not those that showed losses; and (3) claiming a deduction for petitioner's contribution to the SEP

---

[35] We note that, because respondent made determinations in the notice that increased petitioner's self-employment income for 1990, respondent determined that petitioner is entitled to a SEP deduction for that year in an amount in excess of the SEP deduction claimed in petitioner's 1990 return.

[36] If the $99,000 net profit from the sale of the drawing in question had not been reported in Schedule C of petitioner's 1989 return relating to art sales, that return would have reflected an aggregate loss of $39,928 from petitioner's various Schedules C, and, based on that return, petitioner would not have been entitled to a deduction for any portion of the $20,000 contribution that he made to the SEP for that year.

equal to 25 percent (25-percent limit), rather than 15 percent (15-percent limit), of his self-employment income.[37]  For 1991, the underpayment of income tax attributable to petitioner's disallowed SEP deduction resulted from erroneously using the 25-percent limit, rather than the 15-percent limit.

> Erroneous Inclusion of the Gain From the
> Sale of the Drawing in Question in
> <u>Petitioner's Self-employment Income for 1989</u>

Based on the information that petitioner provided to Mr. McVeigh, Mr. McVeigh concluded that the gain from the sale of the drawing in question constituted self-employment income, and not long-term capital gain, and that it should be reported in Schedule C of petitioner's 1989 return relating to art sales.  We have found that petitioner informed Mr. McVeigh that he sold the drawing in question during 1989 at a gain and that he intended to continue to purchase and sell drawings in the future.[38]  We do not know what else petitioner told Mr. McVeigh about the sale of that drawing.  We have found that petitioner did not sell any drawings, artwork, or collectibles after he sold the drawing in question in January 1989, and petitioner testified that, after that sale, he had no intention of continuing to sell drawings.

---

[37]  See <u>supra</u> note 16.

[38]  Petitioner contradicted Mr. McVeigh's testimony when he testified that, after the sale of the drawing in question, he did not tell Mr. McVeigh that he intended to continue to sell drawings.  We believe and accept Mr. McVeigh's testimony on this point, and not petitioner's.

On the record before us, we find that petitioner has failed to establish that any reliance on Mr. McVeigh with respect to the erroneous treatment of the gain from the sale of the drawing in question as self-employment income was reasonable or in good faith.  Consequently, we sustain respondent's determination imposing the accuracy-related penalty on the portion of the underpayment for 1989 that is attributable to that treatment.

### Erroneous Calculation of Petitioner's Self-employment Income for 1989

The parties agree that if the Court were to sustain respondent's determination that the gain from the sale of the drawing in question constitutes long-term capital gain, that gain should not have been included in petitioner's self-employment income for 1989 for purposes of calculating the deductible portion, if any, of petitioner's 1989 SEP contribution.  However, even assuming arguendo (1) that, contrary to our finding, the gain from the sale of the drawing in question were ordinary income, and not capital gain, and (2) that, contrary to the agreement of the parties, the use of the 25-percent limit were proper, the amount of the deduction that petitioner claimed in his 1989 return for the SEP contribution nonetheless exceeded 25 percent of his self-employment income for that year.  That is because, in calculating petitioner's self-employment for 1989, Mr. McVeigh failed to aggregate the results shown in all Sched-ules C of his 1989 return and instead aggregated the results of

only those Schedules C showing net profits.

On the record before us, we find that petitioner's reliance on Mr. McVeigh with respect to the erroneous calculation of petitioner's self-employment income for 1989 (i.e., not aggregating all Schedules C of petitioner's 1989 return) was reasonable and in good faith. Consequently, we reject respondent's determination imposing the accuracy-related penalty on the portion of the underpayment for that year that is attributable to that error.[39]

## Erroneous Use of the 25-Percent
## Limit for 1989 and 1991

We have found that Mr. McVeigh advised petitioner to use the 25-percent limit, rather than the 15-percent limit. Except for petitioner's (1) informing Mr. McVeigh in April 1990 that he had established a retirement plan to which he timely contributed $20,000 and (2) relating to him the conversations that he had had with the individual who had assisted him in establishing that plan, the record does not show what petitioner told Mr. McVeigh about the contributions that he made to a retirement plan for 1989 and 1991. Specifically, we do not know whether petitioner advised Mr. McVeigh that the retirement plan that he had established was a simplified employee pension.

On the record before us, we find that petitioner has failed

---

[39] Mr. McVeigh's error resulted in petitioner's claiming a deduction that exceeded by $5,075 25 percent of the aggregate results shown in the Schedules C of his 1989 return.

to show that any reliance on Mr. McVeigh with respect to the erroneous use of the 25-percent limit, rather than the 15-percent limit, in computing the deductions relating to his SEP contributions for 1989 and 1991 was reasonable or in good faith. Consequently, we sustain respondent's determinations imposing the accuracy-related penalty on the portion of the underpayment for each such year that is attributable to that error.

Petitioner's Failure to Pay Excise
<u>Tax on Excess Contributions to the SEP</u>

Respondent determined that petitioner is liable for each of the years at issue for the accuracy-related penalty under section 6662(a) on the underpayment of excise tax attributable to petitioner's excess contribution to the SEP for each such year on the ground that each such underpayment is attributable to a substantial understatement of income tax within the meaning of section 6662(d). Respondent's determinations are wrong. The underpayment of excise tax for each of the years at issue is not attributable to a substantial understatement of income tax for each such year within the meaning of section 6662(b)(2) and (d). See sec. 6662(b)(4), (d)(1)(A); secs. 1.6662-4(a), 1.6664-2(b), Income Tax Regs. Consequently, we reject respondent's determinations imposing the accuracy-related penalty on the underpayments of excise tax for the years at issue.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered</u>

under Rule 155.